**In re Emil Earl ERDMAN, Jr. d/b/a Erdman Funeral Home, Debtor.**

**Shirley McDONOUGH, Kristine Solberg, and Karyn Ervin, Plaintiffs,**

**v.**

**Emil Earl ERDMAN, Jr., Defendant.**

**Bankruptcy No. 87–05589.
Adv. No. 88–7011.**

United States Bankruptcy Court,
D. North Dakota.

Oct. 11, 1988.

Sheldon Smith, Bismarck, N.D., Greg Lange, Hazen, N.D., for plaintiff.

James Coles, Bismarck, N.D., for defendant/debtor.

William Daner, Bismarck, N.D., Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This adversary proceeding was commenced by complaint of the Plaintiffs, Shirley McDonough, Kristine Solberg, and Karyn Ervin (Plaintiffs), filed January 22, 1988, asking that the Defendant/Debtor Emil Earl Erdman, Jr. (Erdman), be denied a discharge generally pursuant to section 727(a)(2), (a)(3), (a)(4)(A) and (B), (a)(5) and (a)(7). The plaintiffs allege that Erdman, preparatory to filing his Chapter 7 petition on June 26, 1987, concealed, converted and transferred assets and is unable to explain various asset deficiencies; failed to maintain records; made a false oath in connection with the case and otherwise engaged

in impermissible "exemption planning". Erdman generally denies the allegations. Trial was held on August 24, 1988.

*Findings of Fact*

1.

After apprenticeship training, Erdman obtained employment as a mortician and funeral director with the Aarthun Funeral Home in July 1978. The Aarthun Funeral Home, situated in Beulah, North Dakota, was operated for many years as a sole proprietorship by Bernhard Aarthun and enjoyed an excellent reputation. Bernhard Aarthun became ill with cancer and passed away in 1979. Shortly thereafter the entire business comprising the Aarthun Funeral Home was sold to Erdman. The personal property and good will were sold by separate agreement in January 1980, for $109,000.00 and the real property consisting of a Beulah funeral home and a viewing chapel in Golden Valley, North Dakota were sold on contract for deed for $116,-000.00. Another viewing chapel in Hazen, North Dakota was rented from the Aarthun estate for several years by Erdman who, in September 1982, purchased it on a contract for deed. The sale of the business included good will which, due to the highly personal nature of the funeral business, is difficult to value separate from the reputation and ability of the mortician/funeral director. Shirley McDonough, widow of Bernhard Aarthun, and Glen Goetz, an established North Dakota funeral director, both testified that the funeral business is one of often intangible service such as compassion and that the value of a particular funeral home's good will depends upon who had the business. The only tangible basis for value is the number of pre-need contracts and the historical business volume.

Erdman incorporated the business as Erdman Funeral Home, Inc., in 1981 and operated the property formerly known as the Aarthun Funeral Home into 1986 when he began to miss payments on the contract for deed on the Beulah and Golden Valley property. About this time he and his wife began to experience marital problems. He and his wife were divorced by Decree entered December 4, 1986, and the plaintiffs shortly thereafter on December 17, 1986, commenced an action to cancel the contract for deed on the Beulah and Golden Valley properties and recover damages for breach of the funeral business purchase agreement. On February 17, 1987, the plaintiffs obtained a judgment cancelling the contract for deed on the Beulah and Golden Valley properties as well as an award of $106,-528.97 for breach of the funeral home purchase agreement. The Beulah and Golden Valley properties formerly known as the Aarthun funeral home was sold in April of 1987 to another mortician for $72,000.00. Erdman continued his business under the name of Erdman Funeral Homes, Inc. at another Beulah location and also retained the funeral chapel in Hazen, renting it out to others for $750.00 per month. Approximately seven months following the December 1986 divorce, Erdman filed for relief under Chapter 7 of the Bankruptcy Code, relief being entered on June 26, 1987.

2.

Corporate tax returns prepared for the years 1982 through 1986 reveal that gross sales of Erdman's funeral home business went from $207,000.00 in 1982 to a high of $358,000.00 in 1984 before plummeting to an estimated $82,600.00 in 1987. Net corporate income was only $6,137.00 in 1985, declining to minus $73,493.00 in 1986 and an estimated minus $80,574.00 for 1987. Corporate profit and loss statements prepared and maintained by an outside accounting firm substantiate this business decline as do the embalmer' reports from the Clerk of Court for Mercer County. The report of cases handled by Erdman show 74 cases in calendar 84, 88 in calendar 85, 43 in calendar 86 and 35 in calendar 87. Erdman estimates that for 1988 he has thus far handled 60 cases. The average charge for a full service funeral is $3,500.00 which is consistent with the area, however, Erdman testified that not all of the cases in past years were full service funerals.

In connection with operating Erdman Funeral Home, Inc. from which he was paid a salary, Erdman also operated an unincorpo-

rated monument business. Net profits from this business were $27,865.00 in 1982, $9,345.00 in 1983, minus $6,900.00 in 1984, $4,297.00 in 1985, and minus $6,057.00 in 1986. Until just before the bankruptcy filing there remained $2,332.00 in the monument business bank account.

In addition to providing him with a base monthly salary, the corporation paid his medical expenses and all transportation expenses. Beyond these expenses revealed in the corporate tax returns, Erdman also had the corporation issue him checks from time-to-time for personal expenses. Within the six months preceding his bankruptcy twenty-seven checks totaling $8,896.00 were drawn on the corporate account in favor of Erdman personally. These cash payments were in addition to regular salary checks.

The value of Erdman's funeral business was the subject of considerable expert testimony during the state court divorce proceedings in December 1986. The divorce court in reaching a valuation averaged the profitability ratios of sales, rate of return on assets, and rate of return on equity, these figures themselves being developed by Federated Funeral Directors of America based on Erdman's actual experience. Erdman's divorce trial expert put a value of $127,897.00 on the funeral home and monument businesses while his wife's expert pegged it at $381,000.00. The divorce court placed an investment value of $175,173.00 on the funeral home business and $25,000.00 on a monument business.

The bankruptcy schedules only reflection of any value attributable either to the funeral home business or monument business is 25,000 shares of Erdman Funeral Home worth $500.00. This stock was declared exempt under applicable North Dakota law and the monument business is not reflected anywhere in the schedules. Erdman testified that the monument business has no value except what he puts into it.

From testimony presented at trial it is apparent to the court that Erdman did not enjoy the same high reputation that Bernhard Aarthun had. Several funeral directors familiar with Erdman testified that he had a reputation problem.

3.

At the time of the divorce in December 1986 Erdman owned directly or through the corporation fourteen vehicles worth a total of $100,000.00 all, save for a Porsche, were debt-free. Of these he was awarded nine valued at $68,000.00 in December 1986. The principal balance outstanding on Erdman's home mortgage was $28,000.00. In December 1986 Erdman owned and was awarded an IRA valued by the divorce court at $14,341.00. He also owned a paid up $150,000.00 universal life insurance policy for which he paid $10,000.00. On June 24, 1987, he added another $8,000.00 to the policy's cash value but with no increase in coverage.

The only vehicles listed on schedule B-2 are a 1980 Ford pick-up and a 1976 Cadillac hearse both of which were declared exempt. No cash on hand is listed. Insurance cash value is listed at $13,708.00 and is also exempted. The Debtors' homestead valued at $83,000.00 and situated in rural Beulah is also exempted. Prepaid utilities of $2,100.00 are also exempted.

The dramatic decline in non-exempt assets and asset values generally between December 1986 and June 1987 was explained by Erdman as the product of his general disagreement with the divorce court's valuation and pre-bankruptcy planning whereby between December 1986 and June 1987 he tried to convert all non-exempt assets into exempt assets in order to shed them from bankruptcy creditors, the largest of whom were the Aarthun heirs.

In December 1986 the divorce court, via a very detailed decree, awarded Erdman an itemized list of the couples' assets. At that time the assets awarded Erdman were valued by the divorce court at $536,121.00 inclusive of personal property at $19,227.00, personal vehicles at $25,300.00, accounts at $82,921.00, real property at $208,500.00 and the funeral and monument businesses valued at $200,000.00. Schedule B-2 lists household goods worth only $1,080.00 and wearing apparel worth $660.00 inclusive of a diamond ring valued in the divorce decree at $450.00 but valued in the schedule at only $100.00. At the

time of the divorce Erdman was also awarded three diamonds valued at $4,000.00 and which the state judge specifically found to exist and be in the possession of Erdman. These diamonds were not listed in the bankruptcy schedules and Erdman claims they never existed. The five scheduled items of jewelry are valued in the schedules at $175.00 while the divorce court valued them at $680.00.

Further explaining a decline in assets, Erdman explained at trial that he also enjoyed several Canadian hunting trips and took his sons to Disneyland during this time period. How much he spent on these alleged excursions was not revealed nor were any substantiating documents produced. At trial Erdman said he had discussed bankruptcy as a possible option in late 1986 and finally employed the Rosenberg firm with whom he discussed the creation of and management of exemptions. Attorney Ross Espeseth testified that he discussed with Erdman the ability to convert non-exempt assets to exempt assets and that the conversion that occurred was probably done at his recommendation. Attorney Espeseth also said he and Erdman discussed valuing the corporate stock and decided to value the business as defunct rather than as a going concern. The circumstances of particular asset transfers occurring during this period are worthy of more detail: (a) All vehicles and a boat were sold for cash between January 1987 and the date of bankruptcy under circumstances that can only be described as unusual. A 1982 Honda motorcycle valued at $4,800.00 in the divorce decree was sold in January 1987 for $2,000.00 cash. Despite the sale, Erdman kept his name on the title, continued to pay insurance and kept the vehicle in a building he owned. There is no bill of sale. A Porsche valued at $9,500.00 by the divorce decree was sold in March 1987 for $4,500.00. A Wilderness camper valued in the decree at $6,000.00 was sold to Erdman's brother for $5,500.00, but the title was put in the name of another person to avoid the appearance of a sale to a relative. There is no sale receipt. A 1979 Chevrolet Suburban valued in the divorce decree at $6,000.00 was sold in May 1987 for $3,000.00. Again, there is no receipt and title did not transfer until June 1987. Subsequent to the sale Erdman paid for gas and insurance and continued to use the vehicle whenever he needed it, finally buying it back in January 1988. A 1984 Chevrolet Suburban valued in the divorce decree at $18,000.00 was sold for $7,700.00 in May 1987 with the understanding that Erdman would continue using it and pay for insurance and repairs. Subsequent to its sale, Erdman did pay $800.00 for repair of the vehicle. A 1983 Chevrolet Cavalier valued in the divorce decree at $5,000.00 was sold for $2,000.00. A Sylvan boat valued in the decree at $5,000.00 was sold for $4,500.00. According to the testimony of a Chevrolet dealer, the three Chevrolet vehicles were each sold for approximately $1,000.00 below the retail price. No reason was given for Erdman's retained use or possession of the motorcycle and the Suburban except that in the case of the motorcycle the purchaser wanted to avoid higher insurance rates.

(b) An IRA valued at $14,341.00 at the time of the divorce was prematurely cashed in March 1987 rendering a balance of $8,000.00 after deducting the early distribution penalty.

(c) A bank account of $2,332.00 was closed in June.

(d) A Weatherby shotgun valued at $800.00 by the divorce court was given to Erdman's son as was a 22 cal. automatic valued by the divorce court at $500.00. These two gifts are reported in the Debtor's statement of affairs at a total value of $135.00. A deer rifle valued by the divorce court at $250.00 was given to Erdman's brother but this transfer is not reported in the statement of affairs. A gold krugerrand necklace valued in the divorce decree at $200.00 was given to Erdman's mother. This transfer is not reported in the statement of affairs. There were also three other transfers of jewelry valued in the divorce decree at $800.00. According to the Debtor these pieces went to his ex-wife and friends. These transfers are not reported in the statement of affairs or schedules.

The proceeds of the foregoing asset liquidations may be traced as follows:

(a) The mortgage on the Debtor's home which had a principal balance of $28,000.00 was paid off in three payments, the first on June 16, 1987, in the form of a $10,367.00 check noted as a premature IRA disposition, the second on June 23, 1987, of $9,000.00 in cash and a final cash payment of $7,888.00 on June 29, 1987. As a result, the exempt homestead valued at $83,000.00 in the petition is debt free.

(b) Erdman contributed an additional $8,000.00 in cash to a previously paid up $150,000.00 single premium life insurance policy. The effect was to increase the cash value but with no increase in life insurance death benefits. The entire cash value has been exempted.

(c) Erdman prepaid $2,100.00 on his heat and electric bills all of which has been exempted. According to his schedule of current expenses his heat and electric costs run $185.00 per month.

### 4.

The fact of the vehicle transfers and application of the proceeds as well as transfer of rifles to a son are revealed in the amended statement of affairs although in a most cursory way. The fact that a camper went to a relative is not revealed nor is the transfer of the gold necklace to Erdman's mother or a deer rifle to his brother. Schedule B–2(a)(b) lists cash assets and financial accounts at zero when in fact according to Erdman's trial testimony there was a $2,000.00 IRA in Hazen still existing.

Erdman rented out his Hazen home for some time but omitted listing the rents as an asset in his petition nor were they exempted. Nonetheless his schedule of current income reflects an income of $750.00 per month derived from rents.

At trial Erdman stated the funeral home business account had a balance of $2,988.00 on the date of bankruptcy and this sum is also not reflected in the schedules.

The schedules reflect no business accounts receivable yet at the time of the divorce accounts receivable from the Erdman Funeral Home, Inc., business were listed by Erdman himself at $67,789.00 with the divorce judge accepting this value and awarding the business accounts receivable to Erdman. At trial Erdman said these accounts were worthless and merely reflective of a paper transaction between himself and the corporation. However, the accounts as found to exist by the divorce court in December 1986 were derived from a profit and loss statement and a balance sheet which have not been proven to be incorrect.

### 5.

From the documents in evidence it appears through asset disposition, regular income, unusual cash withdrawals from the corporation, IRS refunds and cash on hand as of January 1, 1987, that Erdman, between January 1, 1987, and the date of the bankruptcy filing had cash resources of $83,053.00. According to his testimony and documents in evidence $44,500.90 was consumed by attorneys' fees, bankruptcy seizures, home mortgage payoff, additional cash contributions to life insurance, prepayment of utilities and a $1,144.00 cash payment to his ex-wife. According to the bankruptcy schedules Erdman's monthly living expenses, exclusive of home mortgage and utility expenses (paid off or paid up), insurance and transportation (both paid by the corporation) are $1,037.00 per month. Hence in the approximate six months preceding bankruptcy Erdman actually consumed $6,222.00 for legitimate personal living expenses. At trial he testified to having paid during that time child support of $5,300.00 and payments on secured debt of $2,901.00. A positive cash difference remains of $22,896.00 which Erdman at trial claimed was purely illusionary. Yet the documents do disclose a persistent withdrawal of cash from the corporation and Erdman himself agreed that he dealt in cash for most things believing it a form of communism to let banks control the money. Indeed, even the state judge presiding over Erdman's divorce made particular note in the decree that the business generated income which Erdman kept in cash. Although stating that there is no additional cash existing, Erdman could not

explain this apparent difference saying only that between January and June 1987, it was somehow consumed for living expenses and various vacation trips. No documentation of additional cash expenditures beyond those noted herein were produced by Erdman who testified that documents cause problems and if you can avoid documents you can avoid problems.

6.

When Erdman vacated the Beulah and Golden Valley property being purchased from Aarthun, he or someone under his employ caused considerable damage by spilling embalming fluid throughout the casket selection and office area which necessitated carpet replacement. Although Erdman testified the spills occurred by mistake, the court believes, from the fact that Erdman is experienced in handling such chemicals and from the location of the spills themselves, that they were purposely done. Beyond causing damage to the home itself, Erdman also removed a number of items from the premises that had been subject of the purchase from Aarthun. Missing from the property were a propane tank, a tree, caskets, display racks, clothes display and vault display rack. Glen Goetz, the mortician who took over the Beulah property after cancellation of the Erdman contract testified that many items listed on a schedule of personal property on the premises were missing. Erdman's bankruptcy schedules list no inventory, office equipment or supplies used in business. No explanation was made of what became of these items of personal property. Since these items were sold to Erdman originally, the implication is that he removed them prior to being ousted and still has them or disposed of them.

### Conclusions of Law

■ The Code provisions upon which the plaintiffs base their case are sections 727(a)(2); 727(a)(3); 727(a)(4)(A) and (B); 727(a)(5) and 727(a)(7). These sections provide:

§ 727(a).

The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case-

(A) made a false oath or account;

(B) presented or used a false claim;

\* \* \* \* \* \*

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

\* \* \* \* \* \*

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider;

\* \* \* \* \* \*

Denying a discharge to a debtor is a serious matter not to be taken lightly by a court. Each of the foregoing provisions of section 727 affording an objecting party this drastic remedy are construed liberally in favor of the debtor and strictly against the objecting creditor with the burden resting on the creditor to prove each element by clear and convincing evidence. *In re*

*Montgomery*, 86 B.R. 948, 955 (Bankr.N.D. Ind.1988); *In re Shapiro*, 59 B.R. 844 (Bankr.E.D.N.Y.1986).

### 1.

For a debtor to be denied a discharge under section 727(a)(2)(A) or (B), the facts must show that the debtor transferred, removed, destroyed, mutilated or concealed his property or permitted the same to be done within one year preceding case filing or during case pendency and that it was done with an intent to hinder, delay, or defraud a creditor. *In re Mascolo*, 505 F.2d 274, 276 (1st Cir.1974); *In re Fine*, 89 B.R. 167 (Bankr.Kan.1988); *Matter of Ries*, 22 B.R. 343 (Bankr.W.D.Wis.1982). The plaintiffs believe violation of this section has occurred by concealment of the funeral home's true value, change in cost of goods sold, intentional destruction of property, removal of property from the premises and conversion of non-exempt into exempt property.

▉ Asset concealment, by resulting in deficient bankruptcy schedules and left unexplained may also give rise to relief under sections 727(a)(4) and (a)(5). As with section 727(a)(2), an omission from a statement of affairs or a schedule must have been fraudulently done with a specific intent to deceive. While the intent required must be actual intent as distinguished from constructive intent, it is well settled that such intent may be established by circumstantial evidence with inferences permitted to be made from the debtor's actions. *In re Montgomery*, *supra*, at 957; *In re Tuttle*, 15 B.R. 14 (Bankr.Kan.1981) (*aff'd*, 698 F.2d 414 (10th Cir.1983)). Transfers amounting to what would otherwise constitute a concealment, conversion or schedule omission are countenanced under the Code if the transfer resulted in a conversion of non-exempt to exempt assets so long as the conversion bears no extrinsic evidence that it was done with the intent to defraud creditors. *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871 (8th Cir.1988); *In re Butts*, 45 B.R. 34 (Bankr.N.D.1984).

In the instant case Erdman, upon the suggestion of or after discussion with counsel, embarked upon a wholesale transfer of assets, otherwise non-exempt, to various people including relatives and friends which resulted in a conversion of those assets into state recognized exemptions. These transfers, however, must be guaged against the circumstances surrounding them which, as the court before noted, appear unusual. Courts in looking beyond the mere fact of an exemption creation have come to consider whether the circumstances bear certain indicia or "badges of fraud". These indicia have been noted in the decisions as:

1. An absence of or negligible amount of consideration;
2. The debtor and the transferee enjoyed a family, friendship, or other close relationship;
3. The debtor retained possession, benefit or use of the property in question;
4. The debtor engaged in a sharp pattern of dealing immediately before the bankruptcy;
5. The conversion occurred after the entry of a large judgment;
6. The concealment of the transfer.

*In re Fine*, *supra*, p. 174; *In re Peery*, 40 B.R. 811, 815 (Bankr.M.D.Tenn.1984); *In re Rubin*, 12 B.R. 436, 442 (Bankr.S.D.N.Y. 1981). If the evidence reveals an existence of any of the foregoing indicia then the transfer or conversion may well be accompanied by the requisite intent to defraud.

▉ Where a debtor's actions were motivated by attorney advice, that reliance, if reasonable, may excuse acts which otherwise bear indicia of fraud. However, the attorney must have been made fully aware of all relevant facts—that is, the debtor must have made a full and fair disclosure to him. Reliance on attorney advice absolves one of intent only where that reliance was reasonable and where the advice given was informed advice. *In re Bateman*, 646 F.2d 1220, 1224 (8th Cir.1981); *In re Montgomery*, *supra*, at 958; *In re Ellingson*, 63 B.R. 271, 276 (Bankr.N.D.Iowa 1986). Attorney Espeseth correctly advised Erdman that he could convert non-exempt assets to exempt assets without running afoul of section 727(a)(2). However,

the manner in which that advice was carried out by Erdman suggests an intent to accomplish more than mere exemption preservation. Transfers of the vehicles were for less than the market value and in most instances Erdman retained the title with the right to continued use and the obligation to insure and maintain them. In *Hanson v. First Nat. Bank in Brookings*, 848 F.2d 866 (8th Cir.1988), similar transfers were made to relatives and the court allowed that transfers to relatives while retaining possession might be permissible in limited situations. In *Hanson* as contrasted to the instant circumstances, the purchase was for fair market value with proper title transfer. There was also a reasonable explanation given for why the debtor retained possession. In the instant case the facts surrounding the transfer of these vehicles for less than market value and in some instances retaining full incidences of ownership suggest not so much an honest effort on the part of Erdman to sell the vehicles as much as a means whereby he could quickly dispose of non-exempt property for whatever he could get while at the same time retaining full control of the vehicles he wanted. The various explanations as to why Erdman retained possession are not reasonable. An effort was made to disguise the transfer of the camper to Erdman's brother by listing it in the schedules as being sold to an unrelated third person. In all cases no receipts exist and none of the sales were for what this court regards as being fair market value.

The court has no trouble with Erdman maximizing his exemptions with the resultant proceeds save for heightening the cash value of an already existing and paid up life insurance policy.

Under section 26.1–33–36 of the North Dakota Century Code in effect during the first part of 1987, the cash value of any life insurance policy was absolutely exempt from creditors' claims. Until the statute was amended in July 1987, there was no monetary limit whatsoever. The Eighth Circuit in *Tveten* found the reliance upon an unlimited state exemption to carry with it the potential for unlimited abuse. For a debtor to make full use of such an unrestrictive exemption statute beyond those amounts reasonably necessary to protect the family and avoid impoverishment smacks of fraudulent intent. *Norwest Bank Nebraska, N.A. v. Tveten*, at 875–876. Although the amount sought to be shielded by Erdman was considerably less than the amount involved in *Tveten*, the intended result was the same. Erdman had already provided for his family's insurance needs by a previously paid up policy. The additional contribution of $8,000.00 provided no additional death benefit but did increase the cash surrender value and thereby heightened his exemption under N.D.Cent.Code § 26.1–33–36. This, the court believes, is precisely the type of shielding that was held by the Eighth Circuit to go beyond the purpose for which exemptions are permitted.

In addition to the transfers of cash there are, in this case, other transfers which the court feels amount to an intent to defraud creditors. The gifting of valuable firearms and jewelry worth a total of $1,250.00 bear an indicia of an intent to defraud in that they were gratuitous transfers to insiders.[1] Transfers to relatives are always subject to close scrutiny and where no consideration is given courts generally regard the transfer as being fraudulent. *In re Adeeb*, 787 F.2d 1339 (9th Cir.1986); *In re Fine, supra*, p. 175; *In re Butler*, 38 B.R. 884 (Bankr.Kan.1984).

2.

Section 727(a)(4) relates to the fundamental necessity in bankruptcy that statements and schedules provided by a debtor be accurate and reliable. *In re Burke*, 83 B.R. 716, 720 (Bankr.D.N.D. 1988). Some courts have reasoned that the purpose of this requirement is to see that those interested in the case have provided to them accurate information upon which they can rely without having to dig out the

---

**1.** Section 101(30) defines an "insider" as a relative of an individual debtor or of a person in control of a debtor corporation.

true facts or conduct examinations. *Matter of Hussan*, 56 B.R. 288 (Bankr.Minn. 1985); *In re MacDonald*, 50 B.R. 255 (Bankr.Mass.1985). To be actionable under section 727(a)(4) the debtor must have knowingly made a false statement under oath with the intent to defraud his creditors regarding matters material to the administration of the estate.

Considerable argument has been made in this case regarding the value of the Debtor's funeral business as it existed at the time of filing. The only value the Debtor listed on the schedules was $500.00 for the stock which was put down apparently as being representative of the liquidation value. No other business assets, cash, accounts or receivables were listed except for several vehicles. The plaintiffs, pointing to the amount paid for the Aarthun funeral business originally and the income history of the business, assert that Erdman has sorely undervalued the business in his schedules. When Erdman purchased the Aarthun funeral business for $225,000.00 it was purchased in recognition of Aarthun's long and excellent reputation. That reputation as well as the real property upon which the Aarthun funeral home operated were nearly nonexistent by the time of Erdman's bankruptcy filing. Although the business was incorporated it became essentially a personal service conducted by Erdman and recognized by the public as his business rather than that of Aarthun. Valuing a closely held corporation is always difficult and when that business is heavily dependent upon the performance of a single person, this fact is perhaps the single most important factor in the valuation. This court has previously held, based upon a review of North Dakota case law, that to the extent a business consists of the personal services of the principal, the business has no value because the continued worth of that service is entirely too speculative. *In re Burke, supra,* p. 271. Although the divorce court in assessing a value, employed recognized accounting methods it did so at a time when all physical assets were in place and the business was assumed to be a going concern. The North Dakota Supreme Court has not approved use of the income potential of a principal of a service business as an appropriate way to assess value. *Gooselaw v. Gooselaw,* 320 N.W.2d 490 (N.D.1982). In the recent case of *Dick v. Dick,* 414 N.W.2d 288 (N.D. 1987), the Supreme Court said it was entirely appropriate to assign no value to a personal service business that had no tangible assets. Similarly in *In re Swanson,* 36 B.R. 99, 11 B.C.D. 601 (9th Cir.B.A.P.1984), an accounting practice was regarded as having no value despite a previous divorce court determination of value because, a professional practice's value is generally comprised of nothing more than the principal's future earning ability—a matter relevant to divorce proceedings but irrelevant in a bankruptcy case. Erdman's funeral business was entirely personal in nature and this court believes that Erdman by no means enjoyed a good will which would be considered marketable as was Aarthun's name. His future income productivity as an individual is irrelevant. This court believes it highly doubtful that Erdman, subsequent to the contract for deed cancellation, had a business of any particular value aside from whatever market value the remaining physical assets might have held. The fact that there may well have been physical assets yet remaining is relevant because to the extent the hard business assets held value independent of Erdman's personal involvement, that value should have been listed on the schedules. The facts indicate that there existed cash deposits of $2,988.00 as well as the probable existence of numerous pieces of office equipment and furnishings which Erdman purchased from Aarthun but which, in a unexplained fashion, disappeared. The facts also suggest the likely existence of considerable business accounts receivable.

 Beyond the omitted business assets the facts also suggest that considerable personal assets were additionally omitted from the schedules. Personal property was either omitted completely or severely undervalued. Considerable cash receipts appear to have been received by Erdman personally during the six months preceding bankruptcy but which are not reported on

the schedules. His explanations of why these items are missing and why there appears to be a large cash discrepancy are insufficient. Under section 727(a)(3) a debtor in furtherance of his obligation of full disclosure must maintain and preserve documentary evidence regarding what became of assets that appear to be missing. Creditors are not required to guess at what actually became of missing assets because such speculation does not constitute proof. *First Federated Life Insurance Co. v. Martin,* 698 F.2d 883, 888 (7th Cir.1983).

Under section 727(a)(5) a debtor is given the opportunity to offer explanation of any asset omissions or deficiencies. However, vague, indefinite and uncorroborated explanations are not satisfactory. *In re Reed,* 700 F.2d 986 (5th Cir.1983); *Baum v. Earl Millikin, Inc.,* 359 F.2d 811 (7th Cir.1966). In the case before the court the only explanation Erdman gave for the missing diamonds was that they never existed. Other assets omitted are claimed to have been given to friends and accounts receivables found to exist by the divorce court in December 1986 are now claimed by Erdman to be nothing more than paper transactions. However, no clear evidence was offered by him showing why this should be accepted as fact. Similarly, with the some $23,000.00 that appears to have slipped away somewhere, no explanation was offered other than that it either never existed or that it was somehow spent during the interim. Conveniently, Erdman dealt in cash and kept no receipts or other documents. The failure to offer any documentary evidence to corroborate testimony as to the loss or disposition of assets is regarded as sufficient to deny a discharge under section 727(a)(5). *Chalik v. Moorefield,* 748 F.2d 616, 620 (11th Cir.1984).

### Conclusion

This court, viewing the totality of the circumstances surrounding the transfers, conversions and asset discrepancies believes that it is established by clear and convincing evidence that Erdman transferred, concealed and converted assets with the requisite intent to defraud creditors

under section 727(a)(2); that he failed to keep records of his various cash transactions and property transfers in an effort to obfuscate the transactions and defraud his creditors in violation of section 727(a)(3). Further, the court is satisfied that the proof establishes by clear and convincing evidence that Erdman, with intent to defraud, knowingly omitted assets from his schedules and otherwise failed to satisfactorily explain asset losses in violation of section 727(a)(4)(A) and section 727(a)(5).

In view of the facts and the foregoing discussion, IT IS ORDERED that judgment be entered denying Emil Earl Erdman, Jr. a discharge pursuant to section 727(a)(2), 727(a)(3), 727(a)(4)(A) and 727(a)(5).

JUDGMENT MAY BE ENTERED ACCORDINGLY.