In re James M. CRAIG, Debtor.

Kip M. KALER, as Bankruptcy Trustee for James M. Craig, Plaintiff,

v.

James M. CRAIG, Defendant.

Bankruptcy No. 95–30415.
Adv. No. 95–7066.

United States Bankruptcy Court,
D. North Dakota.

May 7, 1996.

Kip M. Kaler, Trustee, Fargo, ND.

Roger J. Minch, Fargo, ND, for James M. Craig.

### OPINION AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Trustee, Kip M. Kaler, commenced the above-captioned adversary proceeding by Complaint filed October 2, 1995, asking that the Debtor, James M. Craig, be denied a discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(4). The Trustee's multi-count Complaint alleges instances of pre- and post-filing asset concealment as well as omissions and misstatements on the bankruptcy schedules and statement of affairs. The Debtor generally denies any intentional concealment or omissions, suggesting that the situations found offensive by the Trustee are the result of honest mistake or neglect.

Trial was held on March 26, 1996. From the evidence presented, the following shall constitute the court's findings of fact and conclusions of law:

### Findings of Fact

1.

The Debtor, James M. Craig (James), age 50, is a well respected primary care physician with a large practice in Carrington, North Dakota.

Prior to establishing his current Carrington practice, he had practiced for a short time in Montana, Missouri and Nebraska. While a resident of Missouri he filed a Chapter 7 Petition in 1989 in an effort to discharge an IRS claim for unpaid income taxes and penalties. The tax liability arose from a series of failed tax shelters James had invested in.

The Petition was premature in that it did not meet the bar date for a tax discharge. Hence, James obtained a voluntary dismissal which left him with an IRS debt of $513,704 as of June 1993.

Shortly thereafter he moved his family to Nebraska and there was divorced from his former wife by a Decree entered in April 1991, and which left him with a substantial child support obligation and an alimony obligation which is presently $1,500 per month.

Moving to Carrington, North Dakota in 1991, he married his present wife Anne in May of 1992 and took up his medical practice eventually becoming an independent contractor affiliated with the Carrington Health Center. As a Health Center affiliate his base salary is 66% of production with a draw of at least $17,800 per month. In 1994 his net income after business expenses was $231,000. Anne is a nurse with the Health Center earning about $2,000 per month.

James, his wife Anne, and her two children reside on a 17 acre farmstead some fourteen miles north of Carrington. This is the sole residence of both and is consistently occupied by James and the family.

2.

Following his arrival in Carrington, James' personal life became further exacerbated by his financial baggage. In addition to being responsible for a very large tax liability and support obligations, he owed $9,000 to a Montana company for past due lease payments and was the subject of a successful garnishment of his clinic income. He sought legal advice from attorney Thomas Aljets concerning these problems and Aljets, aware of James' insolvent position, advised him and his wife to see to it that Anne's income and assets were kept separate from his so that they would not become subject to James'

creditors. James' financial difficulties and possible solutions were discussed between the Craigs and Aljets many times over several years and Aljets, in negotiations with James' ex-wife and the Montana company raised a Chapter 7 filing as being probable.

*The Residence*

In the latter part of 1993, James arranged for the purchase of their 17 acre homestead which is operated by he and Anne as a hobby farm under the name "A & J Farms." The purchase was made with funds borrowed from Security State Bank and guaranteed by the Health Center, James' employer. James alone signed the note to the bank and along with Anne and the children moved onto the land occupying it as their family home. Upon advice of attorney Aljets, the deed was placed in Anne's name only so that liens would not attach. Although there is no mortgage, James made all note payments and took care of all related home maintenance expenses from his income.

Despite placing the deed in Anne's name, Aljets told James that he would nonetheless have a homestead interest. At trial James stated that whatever interest he has in the homestead acreage was a marital share.

*Bank Accounts*

Throughout their residency in Carrington, there were five bank accounts maintained in Anne's name alone. At trial James stated that this was done to avoid the demands of his ex-wife and protect what he could from the IRS. These are: Super NOW Acct. # 37960; Checking Acct. # 704627 in the name of "A & J Farms—Anne Craig"; Savings Acct. # 2559; Savings Acct. # 2893 and Savings Acct. # 2894. Although the two checking accounts were in Anne's name, both she, and James, regularly drew checks on them for anything from general household expenses to making bank note payments.

Beginning in August 1994 James began to deposit all of his physician's salary checks into the NOW Acct. # 37960. After August 1994, only James' earnings went into this account. Between January 1, 1995 and April 30, 1995, he deposited in excess of $125,000 into this account. As this account was drawn upon by both parties for general family and household needs, Anne's income was deposited exclusively into Savings Acct. # 2559 after August 1994. James had also, from time-to-time, made deposits of his income into this account with the last being made in August of 1993. According to Anne, Savings Acct. # 2894, which was also in her name, was funded solely with James' money. In January 1995, $17,567 was withdrawn from this account and deposited into the Super NOW account. Any balance in Acct. # 2894 as of the date of the Petition was James' money. Likewise, Savings Acct. # 2893, while in Anne's name, was funded entirely with James' earnings. According to his testimony, he was depositing his pay checks into his wife's account in order to segregate and also avoid the IRS, the claims of his ex-wife and other creditors. Account # 704627 was a business or farm account according to James and was funded with his money. Although in the name of "A & J Farms— & Craig," this account was drawn upon by both James and his wife.

*Vehicles*

The Craigs are in possession of a number of passenger and recreation vehicles all of which are titled in the name of Anne Craig. These consist of the following: 1979 Porsche, 1985 Chevrolet Suburban, 1995 Ford Windstar Van, 1994 Ford Escort, 1989 Yamaha Snowmobile, 1992 Artic Cat Snowmobile, 1993 Wildcat Snowmobile, 1993 Larson 20 ft. inboard boat and trailer, 1993 175 h.p. Mercruser motor, 1989 Snowmobile trailer and a Massey Ferguson tractor.

The Porsche and Suburban were originally titled in James' name but came into possession of the Chapter 7 Trustee during his Missouri bankruptcy proceedings. They were purchased out of the estate with James' funds and then titled in Anne's name upon their moving to North Dakota. James characterized this as a gift while Anne said in an earlier deposition that these vehicles were still his.

The Ford Van was purchased in May 1994 through a $17,000 loan from Dakotaland Federal Credit Union. Although only Anne belongs to the Credit Union, both she and James signed the loan documents. She made the initial downpayment from her sav-

ings account but since August 1994 the $400 monthly payment as well as insurance has been made from the Super NOW Acct. # 37960 using James' money. Anne is the primary driver.

The Ford Escort was purchased for use by James' daughter, Catherine. The monthly payments were made from the Super NOW Acct. using James' money.

According to Anne's testimony, the snowmobiles were purchased for family use. The purchase was achieved with a downpayment from the Super Now Acct. and since then all payments to the Credit Union have been from this account using James' money. The boat, motor and related equipment were also purchased in May of 1994 through a loan from the Credit Union with the source of the downpayment again being the Super NOW Account. Since purchase, all monthly payments have been made through this account. The total payment for the boat and snowmobiles is $550 per month.

The tractor was purchased in the same fashion using money from the NOW account and is used by James exclusively. All this property, save for the Ford Escort, is in possession of the Craigs at their family place of residence in Carrington.

Aside from advising the Craigs to put the house in Anne's name alone, attorney Aljets did not advise them how to title their other assets—merely to be sure to keep Anne's property separate from James'.

### 3.

The second Chapter 7 bankruptcy filing which had been in discussion with attorney Aljets for several years was finally accomplished by a Petition filed on May 1, 1995. James engaged attorney Roger J. Minch of Fargo in January and over the months preceding the filing his financial difficulties became only one of several serious issues in his life.

As chief of staff at the hospital he was engaged in a physician peer review as well as morale problems among the nursing staff. One of his children was suffering from mental problems for which the child was eventually hospitalized. Anne, who had been a candidate for kidney transplant since Decem-

ber of 1994, was by the middle of May looking into surgery and on May 17 travelled to Nebraska for a second opinion. Also during this time period James' first marriage was in the final stages of annulment proceedings. These problems did not, however, completely distract James from his financial difficulties. His Health Center wages were garnished in January 1995, and he was in active settlement negotiations with attorneys for his ex-wife. He also investigated the status of his ERISA Plan and SEP accounts to see that the ERISA Plan was qualified in order that any funds contributed to either of these accounts would not become part of an eventual bankruptcy estate.

The Petition itself was signed by James on April 27, 1995, and he was under the impression that it would be actually filed on that date—a Thursday, when in fact, it was not filed until the following Monday, May 1. The Statement of Affairs and Schedules were prepared and signed on May 10, 1995, and filed the following day, May 11, 1995. James knew the significance of the filing date as events of the April 27th weekend illustrate. Over the weekend of April 27th, James agreed to put in overtime duty in the emergency room providing the resultant earnings of $2,640 would be post-petition income. Such was not the case, however, and being in receipt of the clerk's notice of filing, James knew when he signed his schedules on May 10th that the emergency room income constituted pre-petition earnings. He was issued a check on April 30th in the sum of $2,640, the bulk of which was deposited into the Super NOW account on May 11, 1995. According to James, as well as testimony of the Health Center president, James was adamant about working that weekend only if the Petition had actually been filed. He testified at trial that he would not have done the ER shift had he known the filing was not to occur until the following Monday.

Typically, physicians with the Carrington Health Center are issued a check for any production in excess of their monthly draw ten days after the end of the month. The normal practice is for the clinic's payroll department to issue a check and personally deliver it to the physician. On April 6, 1995,

James was issued a check in the sum of $8,399.44 (check no. 035073) for the difference between his March advance and his actual March· production. James testified that he had intended to put this money in his SEP IRA but, in fact, failed to cash the check and it remained his possession as of the date of filing. Only later, on May 10, 1995, did he deposit $7,500 of it into the SEP account with the balance being deposited into the Super NOW account. James did not advise his attorney of this because he did not think it important.

Another excess production check in the sum of $4,989.22 (check no. 035511) was issued to him by the clinic on May 5, 1995, for April production. James knew before he signed the schedules on May 10, 1995, that he had this money coming to him but testified that he thought it was an offset against subsequent earnings. This understanding was never convincingly explained as Craig never asked the clinic for an accounting of any offset and never asked whether he had to pay it back. In fact, all but $10.00 of this check was deposited into the Super NOW account on May 12, 1995.

On April 6, 1995, James received yet another check from the Health Center in the sum of $5,000 (check no. 035070). Although not so identified on the face of the check, the hospital's chief financial officer testified that this was a back payment for a professional component of hemocult tests done by James. It was not an advance. Nonetheless, as with the March production check of $8,399.44, this check remained in his possession uncashed until after the date of the Chapter 7 filing when it was cashed on May 2nd and deposited into the Super NOW account.

*The Schedules and Statement of Affairs*

Although the Petition was prepared and signed on April 27, 1995, and filed on May 1, 1995, the Statement of Affairs and Schedules were not signed until May 10, 1995, nor filed until May 11, 1995—well after James became aware of the actual filing date and at a time when he knew that all four checks received from the Carrington Health Center were pre-petition income constituting part of his estate.

The schedules as originally prepared do not reveal the existence of any of the four checks constituting pre-petition income and all of which were cashed after the petition date but before he signed the schedules. In fact, at the first meeting of creditors held on June 2, 1995, James was asked if he was holding any money or owed any money as of May 1, 1995, to which he said "no." This meeting occurred long after he had received the four checks. Explaining how this could happen, James testified that at the time owing in part to the turmoil in his life, it hadn't occurred to him that this was something he should disclose. As for the post-filing SEP contribution of pre-petition income, James testified that he did not feel he had to report it since it had always been his intention to fund the SEP anyway. Prompted by a Motion For Turnover filed by the Trustee on August 11, 1995, James amended his schedule of personal property on September 22 to show liquidated debt in the form of wages in the sum of $16,028.

The original schedules disclose (albeit with the wrong account number) the apparent existence of the A & J Farm Account having a balance of $100. The schedules also disclose a one-half interest in "wife's account" in the amount of $200 with no account number disclosed.

At trial when asked why he claimed a one-half interest in his wife's account, James stated because it was a marital account in which Anne acquired a one-half interest by marriage. This, despite the fact that the vast majority of NOW account funds came solely from his earnings. None of the other three accounts were disclosed because, according to James, they were in Anne's name alone.

Subsequent to the turnover motion, the Amended Schedules included the total balance in the NOW account without any reduction for Anne's marital share.

Schedule A, asking for the description, location, nature and value of the debtor's interest in real property, discloses nothing, nor does the later amendment. At trial James agreed that no interest is depicted despite the fact that he resides in the home with Anne and family.

As for vehicles and boats, Schedule B, questions 23 and 24, list only a 1994 Ford 150. No interest whatsoever is revealed in any of the other vehicles, snowmobiles, or boat. Question 31 regarding farm equipment discloses a one-half "marital interest" in the tractor. James acknowledged at trial that essentially all funds for purchase of these vehicles, boat and snowmobiles came from his earnings on deposit in the Super NOW account. In his view, this property, being titled in Anne's name, was hers alone. On this point, the Statement of Affairs confuses the issue further. In response to question 14 asking for a listing of all property held for another person, only a cryptic reference is made to property at the homestead apparently referencing Anne's pre-marital property. Nothing is mentioned about vehicles, boats, or tractors that James might have possession of. He agreed at trial that perhaps these should have been disclosed in some fashion.

In a similar vein, in response to question 7 asking for a listing of all gifts made to anyone, including relatives within one year prior to marriage, no mention is made of the extremely large cash outlays James made to purchase the 17 acre homestead, or the various vehicles, snowmobiles and boat. Nothing is even revealed as to their existence. Question 10 of the Statement of Affairs asking for a listing of all other transfers of property of whatever kind made within one year of the filing, is responded to by a single obscure reference to a life insurance policy. No reference is made of cash contributions towards the purchase of property titled or deeded to another. The Amended Statement of Affairs does not provide any further enlightenment as to questions 7 or 10. In response to question 3A asking for a complete listing of all payments on loans or installment purchases aggregating more than $600 to any one creditor made within 90 days of filing, Dakotaland Federal Credit Union is omitted. This, despite the fact that the Credit Union provided financing for the Ford Van, snowmobiles and boat, that Craig signed the loan agreements and that the aggregate monthly payment made from the NOW account containing James' money was $950. At trial, in reply to being asked how he thought he could be making payments on these obligations and yet not reveal it in response to this question, James acknowledged the omission but said he didn't feel the Credit Union was one of his creditors—that Anne was responsible.

Professing to have taken seriously the preparation of the Schedules and Statement of Affairs, James testified that he simply left out everything that belonged to Anne and that any omission of property or property interest was done not with any intent to mislead creditors or the trustee. Rather, any omission was caused due to mistake or misapprehension caused by attorney Aljets segregation recommendation and the unusual pressures of home and business. Following up on this plea of mistake, the Trustee inquired about James' previous Chapter 7 filing in Missouri. James admitted that in the previous case he had also had failed to list the Suburban or any accounts receivables.

### Conclusions of Law

The Trustee, alleging that James has transferred property to his wife and concealed pre- and post-petition estate property through her, asks that he be barred from discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (B). The Trustee also sees the facts as establishing that James made knowing, fraudulent statements as regards his Statement of Affairs and Schedules sufficient for denial of a discharge pursuant to 11 U.S.C. § 727(a)(4).

1.

■ As a preliminary matter, the court will address the issue of proof raised by James. He argues that the standard of proof for a denial of discharge under § 727 ought to be one of clear and convincing evidence. Previously, this court in the wake of *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) has said that the burden of proof is the lesser preponderance of evidence standard. *In re Zinke*, 174 B.R. 1017, 1021 (Bankr.D.N.D.1994). In dictum the Supreme Court stated that the standard of proof for denial of discharge under § 727 is the preponderance of evidence standard. *Grogan*, 498 U.S. at 287–89, 111 S.Ct. at 659–61. Since *Grogan*, courts, including ours, have uniformly taken the position that a pre-

ponderance of the evidence standard is sufficient. *Farouki v. Emirates Bank Intern., Ltd.,* 14 F.3d 244 (4th Cir.1994); *In re Serafini,* 938 F.2d 1156 (10th Cir.1991); *Matter of Holt,* 190 B.R. 935 (Bankr.N.D.Ala.1996); *In re McFarland,* 170 B.R. 613 (Bankr.S.D.Ohio 1994); *In re Sumpter,* 170 B.R. 908 (Bankr. E.D.Mich.1994); *In re Metz,* 150 B.R. 821 (Bankr.M.D.Fla.1993); *In re Hiller,* 148 B.R. 606 (Bankr.D.Colo.1992). In consideration of the foregoing case law, this court remains of the view that the appropriate standard of proof for all causes of action arising under § 727(a) is a preponderance of the evidence.

### 2.

Denial of a discharge to a debtor has been many times remarked upon by this court as a drastic remedy not to be taken lightly. *E.g., In re Magnuson,* 113 B.R. 555, 558 (Bankr. D.N.D.1989); *In re Erdman,* 96 B.R. 978, 984 (Bankr.D.N.D.1988). It is, however, to be remembered that discharge in bankruptcy is intended only for the honest debtor.

■ The relevant portions of § 727(a) provide as follows:

a. The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition; . . . .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; . . . .

Any one of the four acts cited in § 727(a)(2) if committed by the debtor with the requisite element of intent, are sufficient in and of themselves to result in a denial of discharge. With one caveat, the elements essential to

barring a discharge under § 727(a)(2)(A) are: (1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay or defraud either a creditor or an officer of the estate.

■ Unlike the other three proscribed actions, concealment is a continuing event and under the established doctrine of "continuing concealment," a concealment that originated outside the one year limitation period is within the reach of § 727(a)(2)(A) if the concealment continued on into the year preceding the filing coupled with the requisite intent. *Rosen v. Bezner,* 996 F.2d 1527 (3rd Cir.1993); *In re Olivier,* 819 F.2d 550 (5th Cir.1987). Asset concealment is typically found to exist where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of that property continued. Illustrative is the case of *In re Towe,* 147 B.R. 545 (Bankr.D.Mont.1992) where, in an effort to retain antique automobiles, the debtor placed the titles in the name of a closely held non-profit corporation for the purpose of preventing the IRS from effecting a levy and at the same time retaining effective ownership. Continuous concealment was also found to exist in *Rosen, supra,* where a debtor had conveyed the family residence to his wife for no consideration. Although the initial act of concealment occurred outside the one year limitation period, the court in *Rosen* held it to be continuing because the debtor, while not claiming a legal interest in the real property, had nonetheless, retained a secret interest—treating the home just as he had before. In North Dakota, conveyances between close family members for little or no consideration as well as those where a family member ostensibly sells the property to another family member but retains control over the property are presumptively fraudulent. *See Bjorgen v. Kinsey,* 466 N.W.2d 553 (N.D.1991); *H.A. Thompson & Sons v. Hahn,* 135 N.W.2d 166 (N.D.1965).

■ In the case at bar, only funds used to purchase the boat, motor and trailer oc-

curred within the one year time limit. The court, however, does not see the event of transfer as being the central issue under § 727(a)(2)(A). Commencing in 1992, James embarked upon a means to divert his income into assets in which he had no apparent interest but all the while continuing to enjoy the benefits of ownership.

An intent to defraud is rarely susceptible of direct proof. However, it can be established by circumstantial evidence or from inferences drawn from a debtor's course of conduct. This same indicia of intent sufficient to establish a fraudulent transfer may also serve as an indicia of intent for purposes of establishing that there was an active and ongoing concealment. In past cases this court has regarded the following as indicia of an intent to hinder, delay or defraud creditors.

1. An absence or negligible amount of consideration;

2. The debtor and the transferee enjoy a family, friendship or other close relationship;

3. The debtor retains possession, benefit or use of the property in question;

4. The debtor engaged in a sharp pattern of dealing immediately before the bankruptcy;

5. The transfer occurred after a large judgment;

6. The concealment of the transfer.

*In re Erdman,* 96 B.R. at 985 (Bankr.D.N.D. 1988).

Courts have long been concerned over situations where, similar to the case at bar, debtors shield their property from the reach of creditors by placing legal title in others—all the while retaining an equitable interest.

James was consumed by the desire to keep as much of his property as possible away from the IRS and his ex-wife. On several occasions during his testimony he stated that he titled all assets in his wife's name and put his money in her accounts in order to avoid creditors. Similar statements have been held by courts in similar factual situations to constitute an admission of a conveyance with intent to defraud, hinder or delay creditors. *H.A. Thompson & Sons, Inc., supra.* The

court believes by totality of the circumstances that these were sham transactions done purely for the purpose of evading creditors. James was faced with an extremely large IRS claim as well as the claim of his ex-wife and, with a new family undertaking in Carrington, he had every motivation to hide whatever he could from his creditors. From conversations with attorney Aljets, James was aware of the distinctions to be made between property that was solely his and that which was solely Anne's. But he went far beyond Aljets admonition to keep the two separate. He went beyond this advice effectively creating for himself an illusion of destitution by divesting himself of all valuable property of any sort. This court has little trouble concluding that James in pouring his money into the NOW account and, in turn, using that money to purchase assets that while titled only in Anne's name were for family purposes, continuously concealed his assets with the requisite intent to defraud creditors by diverting cash as well as his interest in vehicles and real property into his wife's name. James never offered an acceptable reason other than creditor avoidance for this activity and once accomplished, he professed to have no continuing interest of any kind in those assets. His receipt of pre-petition income and its concealment post-petition also invinces a pattern of fraudulent conduct. Taken alone, the receipt of the employment checks and their nondisclosure might be possibly explained by the other turmoil going on in his life at the time. But these actions cannot be viewed as isolated instances of mistake or confusion on the part of a harried physician. James was no neophyte when it came to financial problems caused by creditors. He had an ongoing contest with both the IRS and his ex-wife, he had had his wages garnished, and had been pursued by his Montana landlord. He had sought the advice of an attorney regarding these problems and knew about bankruptcy some months prior to actually filing. During the months preceding the actual filing he was engaged in methods of protecting his SEP account and his ERISA plan from becoming part of the bankruptcy estate. Most tellingly, he was acutely aware of the critical importance of the actual petition filing date—

aware that it was the demarcation between pre-petition and post-petition earnings. Worse, when questioned by the Trustee at the first meeting of creditors he denied the existence of the checks. Yet at trial, conceded they were big issues. James actions with regards to the Health Center checks are viewed by the court as part of a continuing pattern of asset concealment and his cavalier response to the Trustee's inquiry appears to the court as intentional obstruction of the Trustee's legitimate interests.

### 3.

Section 727(a)(4) has at its heart the purpose of requiring the petition, schedules and statement of affairs to be accurate and reliable without the necessity of the trustee or creditors digging out and conducting independent investigations to get at the facts. *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992). It requires nothing less of a debtor than a full and complete disclosure of all legal and equitable interests—indeed any and all *apparent* interests of any kind. *In re Lunday*, 100 B.R. 502, 508 (Bankr.D.N.D. 1989); *In re Budrow*, 194 B.R. 172 (Bankr. W.D.Tenn.1996). In *Lunday, supra*, this court said:

> A debtor has an uncompromising duty to disclose *whatever* ownership interests he holds in property.... (citation omitted) even if the debtor thinks the assets are worthless he must nonetheless make full disclosure (citation omitted) ... Indeed, the debtor has no discretion—the schedules are to be complete, thorough and accurate in order that creditors may judge *for themselves* the nature of the debtor's estate.

100 B.R. at 508.

In the case of *In re Burke*, 83 B.R. 716, 721 (Bankr.D.N.D.1988) this court, noting that the questions posed in the schedules and statement of affairs are clear and easy to read, said that the information to be provided regarding property is meant to be inclusive of *all* legal or equitable interests consistent with the broad provisions of § 541. It is not for the debtor to pick and choose or to obfuscate his answers. It is recognized, though, that mere carelessness or sloppy schedule preparation without attendant fraudulent intent will not support an action under § 727(a)(4). *E.g., In re Coombs*, 193 B.R. 557 (Bankr.S.D.Cal.1996). The omissions presently in evidence are considerably beyond a single instance of failing to understand or completely respond to one question as was the case in *Burke, supra*. James asks the court to accept the omissions as either the result of a mistake or confusion on his part as to what should have been included. The circumstances point to more than inadvertence. To the contrary, what appears to have occurred are omissions designed to further the asset concealment by a debtor whose abiding purpose was to keep his assets away from creditors. James' claims of carelessness and misunderstanding do not stand well against his historical backdrop. He was no neophyte uneducated in the ways of creditor disputes or bankruptcy requirements. Going into preparation of the schedules and statement of affairs, James had already taken steps to shield his assets and the true nature of his property interests from creditors. He has admitted this. James was told by attorney Aljets that regardless of who held title, he had a homestead interest in the land occupied as a family home. James knew he had this interest yet did not make any reference to it on the schedules. Inexplicably, though, when allowing for an interest in the Super NOW account funded solely by his earnings, he listed a one-half interest, testifying later that he only claimed a one-half interest because it was a "marital account" and Anne acquired a one-half interest by virtue of marriage. Similarly, he accorded her a one-half interest in the tractor because they were married. How he reached this conclusion with respect to the NOW account and the tractor yet not recognizing that the same type of marital interest probably existed in the homestead as well as in the other vehicles is beyond explanation. The court must conclude that James knew he had some kind of an interest, whether legal or equitable in all property in which he and Anne shared and enjoyed as a family and as a married couple. There is no presumption of separate property when that property is intended for use by the family household and which is in joint possession of both spouses. *In re McFarland*, 170 B.R. at 622. State law

governs resolution of property rights within bankruptcy proceedings. *Chiu v. Wong,* 16 F.3d 306 (8th Cir.1994). Although not precisely defined by state statute, the term "marital estate" has been defined by the North Dakota Supreme Court as, "all of the real and personal property accumulated by the parties regardless of its source". *Hofsommer v. Hofsommer Excavating, Inc.,* 488 N.W.2d 380, 384 (N.D.1992). In a divorce situation the concept has been interpreted as including even the separate property of both parties. *Blowers v. Blowers,* 377 N.W.2d 127 (N.D.1985); *Schmidt v. Schmidt,* 325 N.W.2d 230 (N.D.1982). It is simply an unacceptable stretch of the imagination to believe that the home, snowmobiles, vehicles and boat were not intended by he and Anne to be for the benefit of the two of them and their family. If not "marital property" in the sense briefly discussed, then all of James' money that went into purchase and maintenance of this property would have to be regarded as a gift. Yet no mention is made of these items of property in response to question 7 regarding gifts. A debtor cannot have it both ways. Question 7 is very clear. It says debtors must disclose gifts to family members.

The court is satisfied from a totality of the evidence that James in completing his Statement of Affairs and Schedules made a false oath designed to further a scheme of non-disclosure and concealment. The subject matter of the false oath was material in that it gravely concerned the existence and disposition of his interest in property. *See Rott, supra* at 598.

■ Any claim of reliance upon attorney advice does not save James from the court's conclusions. Mistaken reliance upon an attorney's advice will excuse acts of fraudulent intent only if reliance was reasonable and the attorney was aware of all relevant facts. *In re Bateman,* 646 F.2d 1220, 1224 (8th Cir. 1981); *In re Erdman, supra.* Attorney Aljets never told James to embark upon a wholesale scheme of asset concealment. He told him to keep his property separate from his wife's. The court believes James heard only what he wanted to hear and used that advice as license to go beyond legitimate separation of assets.

*Conclusion*

From a totality of the circumstances of this case, the concealments and schedule omissions and discrepancies, the court is satisfied that the Trustee has established by a fair preponderance of the evidence that James concealed his assets with an intent to defraud creditors in violation of § 727(a)(2)(A) and (B), and that in furtherance of an overall scheme of concealment, he knowingly omitted assets from his schedules and otherwise failed to explain satisfactorily these omissions, all in violation of § 727(a)(4).

Accordingly, **IT IS ORDERED** that judgment be entered denying Debtor, James M. Craig, a discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (B), (a)(4).

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**