**In re Kyle A. SMITH, Debtor.**

**Bankruptcy No. 89–05842.**

United States Bankruptcy Court,
D. North Dakota.

March 19, 1990.

Michael Farrell, Trustee.

Brad Sinclair, Fargo, N.D., for St. Luke's Hospital.

Duane Breitling and Dean Rindy, West Fargo, N.D., for debtor.

Lowell Bottrell, Fargo, N.D., for trustee.

Jon Brakke, Fargo, N.D., for Fargo Clinic, Ltd. and Radiologists, Ltd.

Carlton Hunke, Fargo, N.D., for Farmers Union Property and Casualty Co. and Kathryn Ahlberg.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the court on objections to the Debtor, Kyle Smith's (Kyle), claim of a $90,000.00 annuity policy as exempt under the North Dakota exemption statutes.

St. Luke's Hospitals of Fargo, Inc., Fargo Clinic, Ltd., National Farmers Union Property and Casualty Company and the Chapter 7 trustee all object to the Debtor's exemption of a single premium immediate income annuity policy charging that the purchase was in consequence of a fraudulent scheme to convert non-exempt personal injury insurance proceeds into exempt property. Also challenged is the availability of such an exemption where the annuity has been in effect less than one year. Finally, St. Luke's claims a hospital lien which it argues is enforceable against the annuity.[1]

A hearing was held before the undersigned on February 27, 1990.

### Facts

1.

Kyle Smith is a single person presently 25 years of age who, lacking a high school diploma, has been employed in a series of menial jobs earning just over minimum wage. His income has been less than $5,000.00 in past years and at the time of the injury discussed below, he was earning $4.40 per hour from his employment in a custom cabinet shop. On April 24, 1989, he sustained serious injuries when the motorcycle he was operating was struck by a pickup truck operated by Kathryn Ahlberg. He was immediately transported to St. Luke's emergency and thereafter remained hospitalized until June 9, 1989. Upon his release he continued to receive outpatient treatment until August 28, 1989. In consequence of the services rendered by the hospital and clinic, Kyle incurred medical bills of $57,298.98 in the aggregate.[2]

Kyle returned to his former employment in early September, 1989, but was assigned lesser responsibilities. Finally, he was laid off in January 1990, because the production manager felt he lacked adequate motor

---

1. The validity of St. Luke's Hospitals lien is the subject of a separate adversary proceeding, the resolution of which has no bearing upon whether Kyle should be allowed the exemption objected to. The lien will not be addressed within the context of this Memorandum except as necessary to gain an understanding of the claimed exemption and objections.

2. St. Luke's $48,057.00; Fargo Clinic, Ltd., $8,459.78; MeritCare–Neuroscience Clinic $455.20; Radiologists, Ltd., $327.00.

skills with which to do his job safely. He is presently employed as a pizza delivery man for $4.00 per hour.

Kyle's personal injury claim was settled by payment to him of policy limits by the Ahlberg's insurance carrier, National Farmers Union. Ninety thousand dollars of the One hundred thousand dollar settlement was used to purchase an annuity policy under which the Debtor is to receive $728.00 per month commencing December 1, 1990. The annuity became effective on August 28, 1989, with payments continuing for life and guaranteed for twenty years.

A petition for relief under Chapter 7 of the Bankruptcy Code was filed on November 1, 1989. Virtually all scheduled unsecured claims stem from the motorcycle accident including the claims of the medical providers, none of whom have been paid. The annuity policy was claimed as exempt under N.D.Cent.Code § 28–22–03.1(3) as set forth below:

**Additional absolute exemptions for residents.** In addition to the exemptions from all attachment or process, levy and sale upon execution, and any other final process issued from any court, otherwise provided by law, a resident of the state may select ...

3. Pensions; annuity policies or plans; life insurance policies which, upon the death of the insured, would be payable to the spouse, children, or any relative of the insured dependent, or likely to be dependent, upon the insured for support and which have been in effect for a period of at least one year; individual retirement accounts; Keogh plans and simplified employee pension plans; and all other plans qualified under section 401 of the Internal Revenue Code [Pub.L. 83–591; 68A Stat. 134; 26 U.S.C. 401] and section 408 of the Internal Revenue Code [Pub.L. 93–406; 88 Stat. 959; 26 U.S.C. 408], and proceeds, surrender values, payments, and withdrawals from such pensions, policies, plans, and accounts, up to one hundred thousand dollars for each pension, policy, plan, and account with an aggregate limitation of two hundred thousand dollars for all pensions, policies, plans, and accounts. The dollar limit does not apply to the extent this property is reasonably necessary for the support of the resident and that resident's dependents, except that the pensions, policies, plans, and accounts or proceeds, surrender values, payments, and withdrawals are not exempt from enforcement of any order to pay spousal support or child support, or a qualified domestic relations order under sections 15–39.1–12.2, 39–03.1–14.2, and 54–52–17.6. As used in this subsection, "reasonably necessary for the support" means required to meet present and future needs, as determined by the court after consideration of the resident's responsibilities and all the present and anticipated property and income of the resident, including that which is exempt.

2.

Upon admission to the hospital Kyle, in addition to skeletal injuries, exhibited significant cognitive deficits, which caused his father, Leroy Smith, with whom he was living at the time to consult with Attorney Ralph R. Erickson on May 2, 1989. They discussed Kyle's disability and the probable necessity of a guardianship. Leroy petitioned the county court for appointment of himself and Kyle's mother as temporary co-guardians on May 3, 1989, and were so appointed by Order entered June 8, 1989. The appointment order recognized that the only appreciable asset Kyle had was a chose in action arising out of the motorcycle accident and provided there could be no settlement without court approval.

Prior to meeting with Attorney Erickson, Leroy had met at the hospital with Ron Ehley, a claims adjuster for National Farmers Union, who had made an investigation of the accident and the extent of insurance limits. They talked about medical bills and the adjuster told Leroy that the way it looked they were very much in to the policy limits. Leroy asked him about payment of the hospital bills and was advised by Ehley that the company generally pays directly to the insured who, in turn, is left to deal with

the hospital. Attorney Erickson called Ehley on May 5th advising him of his involvement in the case and further telling him not to pay any hospital bills. Erickson had by then concluded, as had Ehley, that it was a policy limits case.

In June Attorney Erickson discussed aspects of Kyle's case with one of his partners who specialized in bankruptcy with the conversation focusing on how to best protect any settlement proceeds from creditors. Bankruptcy exemptions were discussed.

A retainer was prepared by Attorney Erickson for the employment of the firm in connection not only with Kyle's personal injury settlement but also in connection with any potential bankruptcy. The retainer was discussed with and signed by the co-guardians on June 22, 1989. Kyle was also at this particular meeting. At this meeting Erickson discussed with them what Kyle's long term problems might be, his assets, his recovery prospects and the risks and benefits associated with a bankruptcy filing. Attorney Erickson was aware at this time of Kyle's ongoing therapy and his continued need of it. He knew that if they were successful in protecting the settlement proceeds there would be no money with which to pay the medical bills. Erickson testified that bankruptcy and the possibility of exemptions had been discussed in a general way with Kyle several weeks prior to this June 22nd meeting.

In the meantime, Ehley and his supervisors continued to evaluate the claim from a company standpoint and were concerned, based upon the size of the medical bills and the possibility of a permanent leg injury, that it was a policy limits case that should be settled. On July 19, 1989, Attorney Erickson called Ehley advising him that it was indeed a policy limits case and that Kyle would settle for the $100,000.00 policy limits but wanted a structured settlement. The merits of a structured settlement were discussed with Kyle but National Farmers Union was not willing to provide an annuity themselves, preferring instead to pay Kyle the $100,000.00 directly in exchange for a full release of their insured. Attorney Erickson relayed Ehley's offer and concerns to the co-guardians telling them on July 25, 1989, that in view of National Farmers Union's reluctance to structure a settlement that they should do it themselves because Kyle, upon termination of the guardianship, would not be capable of handling that kind of money and would just fritter it away. There was also concern expressed about future medical expenses, and Kyle's probable support obligation arising in consequence of his having fathered an out of wedlock child. The firm had continued its research into various aspects of bankruptcy law and Attorney Erickson again at this time advised the co-guardians that there was a possibility of protecting the proceeds. They talked about a lump sum payment to Kyle but Erickson advised that it was out of the question and that the county court in any event would never approve it. He was of the opinion and so told the guardians that even annual payments would be a problem for Kyle to handle. On this same day he requested of St. Luke's that it send him the medical records and bills but made no mention to them of any settlement nor did he offer to pay the bills.

On August 1st Attorney Erickson telephoned the adjuster advising him that Kyle would settle for $100,000.00 in exchange for a release of all parties. The next day he followed up with a letter to Ehley containing a breakdown of Kyle's medical bills.

The insurance company assumed during this time that Attorney Erickson would work out the matter of the unpaid medical bills after the policy limits had been paid but was aware from comments made during the annuity discussions that bankruptcy was being considered. Indeed, in an intercompany letter dated August 7, 1989, the home office claims department indicated a concern over Attorney Erickson's indication that he would have Kyle file bankruptcy rather than resolve the outstanding medical bills. Ehley testified that he thought Erickson's references to bankruptcy were just a negotiation ploy to get the bills settled.

In a letter of August 9, 1989, Ehley expressed concern over N.D.Cent.Code

§§ 9–08–08 and 9–08–09 which provide for the avoiding of settlements made within six months of the injury.[3]

Settlement was reached pursuant to the August 9th letter and Attorney Erickson drafted a petition for county court approval. The petition references Kyle's willingness to settle for $100,000.00 with disposition to be made as follows:

Attorneys present and future fees and costs $5,656.00; cash to Kyle $4,344.00; $90,000.00 to be invested in the purchase of an annuity. The petition provides that $900.00 of the attorney's fees is to cover future fees and costs incurred in bankruptcy. The petition was discussed with Kyle and the guardians with Erickson again reiterating the benefits to them of an annuity. The petition was filed with the county court and a hearing was held on August 25, 1989.

At the hearing the guardians as well as Kyle testified as to their understanding of the settlement. All were queried on the $90,000.00 annuity with Kyle being specifically asked if he and his attorney had discussed preparing a bankruptcy petition to take care of the medical bills and ensure that he actually receive the money. Kyle indicated he understood. Kyle also agreed that he was still taking outpatient therapy. The court authorized settlement and Attorney Erickson prepared a release and settlement agreement which was signed by the co-guardians and by Kyle as an incapacitated person on August 25, 1989.[4] As re-

quested by Farmers Union, the agreement contained a hold harmless provision by which co-guardians personally and in their representative capacity agreed to hold harmless Kathryn Ahlberg as well as David Ahlberg and all other persons potentially liable from any and all causes of action arising out of the accident.

St. Luke's was not advised of and did not appear at the settlement hearing. Attorney Erickson testified at the hearing on the present objections that he knew as long as there were outstanding bills that the hold harmless would be ineffective. According to Ehley, the company would not have settled for policy limits had it known the bills were not to be paid. He also testified that he knew Kyle's signature as an incapacitated person would not have any weight without the additional signatures of the guardians.

In any event, the money was received by Kyle and on August 29, 1990, Erickson made application for the annuity.

On October 25, 1989, the guardianship was terminated.

Although there had been communications between the hospital, the claims adjuster and Attorney Erickson, the hospital was never told that the bills would not be paid until August 30, 1989, when the credit department called Attorney Erickson and was told by him that Kyle was going to file bankruptcy. The hospital verified the fact

3. **9–08–08. Settlement of damages for personal injuries voidable.** Every settlement of adjustment of any claim for relief for damages on account of any personal injuries received, whether death ensues or not to the person injured, and every contract of retainer or employment to prosecute such an action is voidable if made within thirty days after the injury or if made while the person so injured is under disability from the effect of the injury so received and within six months after the date of the injury.

**9–08–09. Recission of contract for damages for personal injuries.** Any person sustaining personal injuries, or in case of his death, his personal representative, may elect at any time within six months after the date of such injury to avoid any settlement, adjustment, or contract made in connection therewith within the time mentioned in section 9–08–08, by a notice in writing to that effect. The bringing of an action

to recover damages for such injuries avoids any such settlement or adjustment. Whenever an action is commenced within the period of time herein limited to recover such damages, the amount received by the injured person, or his representative, in case of his decease, in any such settlement or adjustment is not a bar to the prosecution of the action but may be set up as an offset or counterclaim to the amount of damages recoverable, if any, or applied toward payment of any judgment recovered in any such action if such amount so received by the injured person or his representative has not been pleaded specifically as an offset or counterclaim.

4. Although still under a legal guardianship, Kyle's attending physician in an August 15, 1989, letter indicated that in his opinion a guardianship was no longer needed and that Kyle could be responsible to act on his own behalf.

of settlement and then took steps to file a hospital lien.

Erickson agrees he never seriously pursued settlement with the hospital and made no formal offers. Nor did he ever check into purchasing an annuity of lesser sum.

The Chapter 7 bankruptcy petition was prepared in the middle of October and was filed on November 1, 1989.

Attorney Erickson testified that his advice regarding the purchase of an annuity would have been the same irrespective of medical bills due to Kyle's inability to manage that sum of money, coupled with the future child support obligation. Leroy Smith as well as Kyle testified that they relied on Attorney Erickson's advice on all matters. Erickson agrees.

### Discussion

#### 1.

■ The objecting creditors first of all argue that the exemption available under N.D.Cent.Code § 28–22–03.1(3) is not legally available to the Debtor because the annuity policy was not in effect for a period of one year. Reaching this interpretation requires one to disregard the statute's punctuation. As pertinent to this issue the statute reads:

> Pensions; annuity policies or plans; life insurance policies which, upon the death of the insured would be payable to the spouse, children or any relative of the insured dependent, or likely to be dependent, upon the insured for support and which have been in effect for a period of at least one year; ...

The creditors urge that the semicolon appearing after the words, annuity policies or plans be ignored in order to give effect to what they believe was a legislative intent to limit the availability of the exemption to those annuities which had been in effect for at least one year. Minutes of the House Standing Committee are not clear as to whether the *sense of the legislature* was to make the one year waiting period applicable to all pensions and annuities or rather just as regards life insurance policies. A representative of the North Dakota Banker's Association testified in opposition to the Bill saying that a person, "Should show an intention by paying premiums for a while so he doesn't just use this the day before filing for bankruptcy." *Hearings on S.B. 2053 before House Standing Committee on the Judiciary*, 1987 N.D. Legislative Assembly, March 16, 1987 (testimony of Tom Kelsch for the N.D. Banker's Assn.). The minutes further reflect, "There was testimony on this that somebody who wanted to go into bankruptcy could go out and buy an annuity or a life insurance policy today for up to $200,-000.00 and tomorrow go through bankruptcy and that would be judgment proof. His proposed amendments would fix that with the words, 'which had been in effect for a period of at least one year.' " *Hearings on S.B. 2053 before House Standing Committee on the Judiciary*, 1987 N.D. Legislative Assembly, March 18, 1987 (reporters minutes—speaker not identified). The foregoing are the only indicia of legislative intent. The minutes of the North Dakota Senate hearings reflect discussions only on a dollar limitation with no discussion at all on an eligibility waiting period. *Hearings on S.B. 2053 before Senate Standing Committee on the Judiciary*, 1987 Legislative Assembly, January 14, 1987. The Bill itself as passed contains the semicolons which the creditors now argue will lead to an absurd result contrary to the expressed legislative intent.

■ The federal case law as well as the North Dakota Supreme Court hold that in divining the purpose or intent of a statute, court's must resort in the first instance to the language of the statute itself. *In 're Erickson Partnership*, 856 F.2d 1068, 1070 (8th Cir.1988); *Wills v. Schroeder Aviation, Inc.*, 390 N.W.2d 544, 546 (N.D.1986); *City of Dickinson v. Thress*, 69 N.D. 748, 290 N.W. 653 (1940). Although legislative history can be a guide to statutory purpose, the mere fact that the statutory provisions conflict with the legislative history is not in itself sufficient justification for a deviation from the statutory provisions. The language of the statute itself is regarded as conclusive of legislative intent unless the statute is clearly ambiguous or creates an irrational result. *Er-*

*ickson* at 1070. Legislative history, however, cannot be used to create the ambiguity or the irrational result. *U.S. v. Public Utilities Comm'n.*, 345 U.S. 295, 315, 73 S.Ct. 706, 717, 97 L.Ed. 1020 (1953). The United States Supreme Court in *United States v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) said:

> There is a basic difference between filling a gap left by Congress' silence and re-writing rules that Congress has affirmatively and specifically enacted.... Nor is the judiciary licensed to attempt to soften the clear import of Congress' chosen words whenever a court believes those words lead to a harsh result.... On the contrary, deference to the supremacy of the legislature, as well as recognition that Congressmen typically vote on the language of a Bill, generally require us to assume that the legislative purpose is expressed by the ordinary meaning of the words used.... Going behind the plain language of a statute in search of a possibly contrary Congressional intent is a step to be taken cautiously even under the best of circumstances. *United States v. Locke*, 105 S.Ct. at 1793. (citations omitted).

*See also, Edwards v. Valdez*, 789 F.2d 1477 (10th Cir.1986). This sentiment is codified in North Dakota law by N.D.Cent.Code § 1–02–05 which provides:

> "When the wording of a statute is clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."

On this point the North Dakota Supreme Court in *Thress* has said:

> "It must be presumed that the legislature intended all that it said, and that it said all that it intended to say. The legislature must be presumed to have meant what it has plainly expressed. It must be presumed, also, that it made no mistake in expressing its purpose and intent. Where the language of a statute is plain and unambiguous, the court cannot indulge in speculation as to the probable or possible qualifications which might have been in the mind of the legislature, but the statute must be given effect according to its plain and obvious

meaning, and cannot be extended beyond it." *Thress* 290 N.W. at 657 (citations omitted).

There is no ambiguity on the face of the statute itself. N.D.Cent.Code § 1–02–03 provides that words and phrases are to be construed according to the rules of grammar. A semicolon is used to separate independent statements or clauses which have been joined together in one sentence without a conjunction. *Websters Third New International Dictionary* (1981); L. Hutchinson, *Standard Handbook for Secretaries* (8th ed. 1972). As enacted the statute when read with its punctuation provides for exemption of annuity policies without any qualifying effective date. In *Thress* the North Dakota Supreme Court said that punctuation of a statute which is grammatical is not to be disregarded. This court believes that section 28–22–03.1(3) is clear and unequivocal on its face and that it is improper to resort to House Committee comments which in themselves are attenuated to supplant the meaning of the section itself or create ambiguity as to its meaning. Accordingly, the Debtor's claim of exemption does not fail on this basis.

**2.**

■ We now reach the question of whether Kyle should be denied the exemption because of the nature and extent of his prebankruptcy estate planning. Although the issue in this case arises in context of exemption creation, the standard applied is the same as that used in the context of objections to discharge under section 727(a)(2). The standard is by now well established i.e., "absent extrinsic evidence of fraud, mere conversion of non-exempt property to exempt property is not fraudulent as to creditors even if the motivation behind the conversion is to place those assets beyond the reach of creditors." *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 874 (8th Cir.1988); *In re Lindberg*, 735 F.2d 1087, 1090 (8th Cir.1984). The burden of establishing the requisite fraudulent intent by extrinsic evidence rests with the objecting party. Rule 4003(c) Federal Rules of Bankruptcy Procedure.

■ Although this court in several recent cases has, from its review of the case law, attempted to list various circumstances which bear an indicia of fraudulent intent, to-wit: (1) an absence of or negligible amount of consideration, (2) the debtor and the transferee enjoyed a family, friendship, or other close relationship, (3) the debtor retained possession, benefit or use of the property in question, (4) the debtor engaged in a sharp pattern of dealing immediately before the bankruptcy, (5) the conversion occurred after the entry of a large judgment, (6) the concealment of the transfer (citations omitted). *In re Lunday*, 100 B.R. 502 (Bankr.D.N.D.1989), *In re Erdman*, 96 B.R. 978 (Bankr.D.N.D.1988), the list is by no means exclusive or indeed applicable in all cases. For example, enumerated factors 1, 2, 3 and 5 of the listing are more appropriate to cases of fraudulent transfer or concealment in the context of section 727 than exemption creation since in an exemption creation situation the converted property would likely be retained by the debtor with relationships and the fact of a large judgment being largely irrelevant.

In our Circuit the governing law is as set forth in *Tveten, supra*, and its companion case, *Hanson v. First Nat. Bank in Brookings*, 848 F.2d 866 (8th Cir.1988). These two cases, together with the more recent case of *In re Johnson*, 880 F.2d 78 (8th Cir.1989) have been the subject of much debate and the cause of much confusion as well. In both *Tveten, supra*, which was a discharge action, and *Hanson*, which was an exemption case, the court focused upon the financial circumstances of the debtor, the value of the property involved and the result and effect of the transfer upon the debtor's post-discharge life. In both cases the court noted the purpose of exemptions is to provide a debtor with a fresh start. It was on this note that the court in *Tveten* became agitated over Dr. Tveten's wholesale conversion of his $700,-000.00 net worth into exemptions. "Dr. Tveten," said the court, "did not want a mere fresh start, he wanted a head start." His attempt to shield property with $700,-000.00 "went well beyond the purpose for which exemptions are permitted". *Tveten*, 848 F.2d at 876. In considering the nature and amount of the exemption, both *Johnson* and *Tveten* instruct that courts keep in mind the following social policies implicit in legitimate exemptions:

1. To provide the debtor with property necessary for his physical survival;

2. To protect the dignity and the cultural and religious identity of the debtor;

3. To enable the debtor to rehabilitate himself financially and earn income in the future;

4. To protect the debtor's family from the adverse consequences of impoverishment;

5. To shift the burden of providing the debtor and his family with minimal financial support from society to the debtor's creditors.

*Johnson*, 880 F.2d at 82; *Tveten*, 848 F.2d at 876.

In *McCormick v. Security State Bank*, 822 F.2d 806 (8th Cir.1987), a discharge case, the court also found it significant that the debtor had engaged in covert or clandestine activity in achieving a transfer of non-exempt property into exempt property during active loan negotiations with a bank. In that case the debtor lied, telling the bank he would make a payment on the loan from another source and advising it that he did not have the cash resources to presently make payment, which in fact he did. Although *Tveten* and *Hanson* also recognize conduct intentionally designed to deceive creditors as indicia of fraud, the facts of *McCormick* are better illustrative of false pretenses employed in the obtaining of credit or achieving collection forbearance than they are of fraudulent intent in the creation of an exemption, although the property concealed by the debtor in *McCormick* was used to fund an exemption. The *McCormick* case was decided prior to the *Tveten, Hanson, Johnson* trilogy and did not, as do these later cases, discuss in detail the social policy behind exemptions as it interrelates with the bankruptcy concept of a "fresh start".

■ The teaching of this recent trilogy of Eighth Circuit case law is that the conversion of non-exempt property to exempt status is allowed if it furthers the social policy inherent in exemptions even if the reason for the exemption was to shield the property from creditors, so long as the conversion was not accomplished through covert actions which caused a creditor to extend or renew credit. The focus is "fresh start"—whether by the exemption the debtor achieves a fresh start or something more—sometimes termed the "pigs and hogs approach".

■ In the case at bar Kyle did not receive medical treatment due to any representations by him, his attorneys or guardians that the bills would be paid. Although the medical providers doubtless assumed the bills would be paid, Kyle was accepted as an emergency patient without regard for whether he had financial resources or not. It was purely fortuitous that Kyle's injury resulted from an accident in which insurance played a part. St. Luke's was never mislead into providing treatment by any representations by the insurance adjuster for Farmers Union, by Kyle himself or his representatives that the bills would be paid from insurance proceeds. No promises or assurances were ever given the hospital by Attorney Erickson.

There was nothing covert about the transfer of the proceeds into an annuity. The possibility of the transfer and the resultant creation of an exemption under Federal Bankruptcy Law had been discussed for some time and Farmers Union knew in June that an annuity was being sought and that bankruptcy was being considered by Kyle's attorneys and guardians. St. Luke's knew Kyle had guardians, it knew he was amassing considerable medical bills and it was aware of ongoing negotiations between Kyle and Farmers Union. Its failure not to learn of the settlement until the end of August was not due to covert efforts at concealment by Kyle or his attorneys. The hospital simply failed to seek out or otherwise apprise itself of information that was available to it. The guardianship, which was obtained in early June and which was a matter of public record, mentioned bankruptcy.

National Farmers Union argues that it was mislead into settling for policy limits by Kyle's attorney who let the company believe the settlement proceeds would in part be used for satisfaction of the hospital bills. This argument is belied by the company's own letter of August 7, 1989, by which it is quite apparent that National Farmers Union not only knew of Kyle's probable bankruptcy but knew also of the possibility that the medical bills would not be paid. Moreover, the insurance company, through its claims adjuster, knew by the end of June that bankruptcy was a possibility. Indeed that was one of the reasons prompting the inclusion of a hold harmless clause in the settlement document. It strikes the court that the company was distinctly aware of Attorney Erickson's bankruptcy planning long before it handed over the settlement check and accepted the settlement agreement in exchange. There is nothing in the facts suggesting that had the medical providers asked the adjuster, Kyle himself, or his representatives it would have been told of the annuity negotiations and the bankruptcy possibilities.

The creation of the exemption was a means of not only shielding the proceeds from the claims of the medical providers but was also in furtherance of providing Kyle with minimal financial security in the future. The amount of the exemption is not so extreme as to strike the court as being beyond the reasonable. *Contra see In re Erdman, supra.* Kyle has less than a high school education, is possessed of limited job training, has a poor employment history, poor earning history, and, it is safe to say, poor employment prospects. He is also liable for child support payments of an undetermined amount. Attorney Erickson was, the court believes, eminently correct in his belief that had Kyle been paid the entire settlement in cash he would have squandered it in short order. The annuity was entirely appropriate as a means of providing Kyle with the means of survival, a way to rehabilitate himself, and the means of protecting himself as well as his

**588**

dependent from impoverishment. Seven hundred and twenty-eight dollars per month is not a great sum and barely places Kyle above the poverty level even in light of his current employment which is just at minimum wage. The social policy behind the exemptions has not been violated in this case. In *Johnson, supra,* the Eighth Circuit said, "The power sanctioned in *Tveten* [the inferring of fraudulent intent with respect to transfers on the eve of bankruptcy and thereby denying a debtor a discharge] should be reserved for exceptional cases ..." *Johnson,* 880 F.2d at 84.

This is not one of the exceptional cases under the *Tveten, Hanson, Johnson* guidelines.

Accordingly, the court finds that the objecting creditors have failed to prove that the Debtor, Kyle Smith, acted with the actual intent to defraud necessary to deny him an exemption of the annuity under N.D.Cent.Code § 28–22–03.1(3). The objections are overruled.

SO ORDERED.