In re Loren & Loretta BERNSTEIN, Bernstein Ranch, LLC, a consolidated case, Debtor.

Bernstein Ranch, LLC, Plaintiff,

v.

United States of America, State Bank of Towner, Daniel Bernstein, Jeffrey Bernstein and Samuel Bernstein, Defendants.

Bankruptcy Nos. 98–31202, 98–31201. Adversary No. 98–7058.

United States Bankruptcy Court, D. North Dakota.

Jan. 11, 1999.

Benjamin Pulkrabek, Bismarck, ND, for plaintiff.

Phillip D. Armstrong, Minot, ND, for plaintiff.

Shon Hastings, Fargo, ND, for USA/Farm Service Agency.

Michael McIntee, Towner, ND, for Western State Bank.

Bernstein Ranch/Loren & Loretta Bernstein, for debtors.

### MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Plaintiff–Debtor, Bernstein Ranch, LLC ("BR"), commenced the instant adversary proceeding on August 18, 1998, seeking a determination that its interest in $42,384.00 in proceeds from a foundation herd livestock sale is, by virtue of a series of agricultural supplier's liens, paramount to the competing security interest held by the Farm Service Agency ("FSA").[1] BR asks that FSA release its claim by endorsing the proceed checks totaling $42,384.00 to thereby allow payment of its supplier's lien claim totaling $52,423.99 in the aggregate.

Answering, FSA asserts that under applicable North Dakota law an agricultural supplier's lien does not extend to a base or foundation herd. Additionally, FSA challenges the manner by which BR calculated the dollar amount of its claim and believes there to also exist certain statutory deficiencies in its various lien statements.

The parties are in essential agreement as to the facts, having filed a Joint Stipulation of Uncontested Facts. Trial was held on December 15, 1998. From the evidence produced at trial coupled with the stipulated facts, the Court finds the facts as material to be as follows:

#### Findings of Fact

1.

Three brothers, Jeffrey, Daniel and Samuel Bernstein have maintained a livestock operation in Bottineau County, North Dakota since 1987. In April 1988, FSA, by separate notes, loaned each of the brothers the sum of $56,900.00 taking as collateral a security in-

---

1. Defendant Western State Bank, fka State Bank of Towner, does not claim an interest in the proceeds and was voluntarily dismissed as a defendant to this action.

terest in all livestock owned by each of the brothers together with the proceeds. The security interests as thus extended were duly perfected by the filing of financing statements. FSA has remained continuously perfected and the validity of its security interest in the brothers' livestock is not at issue in these proceedings. As of September 22, 1998, the unpaid indebtedness owing by Jeffrey was $57,379.69; by Daniel $57,748.91; and by Samuel $57,428.57.

2.

In December 1994, the three brothers and their parents organized a limited liability company under the laws of North Dakota, calling it "Bernstein Ranch, LLC." A Certificate of Organization was issued by the Secretary of State on January 9, 1995.

Concurrent with the formation of the limited liability company, the three brothers began to experience difficulties in finding operating funds and turned to the newly formed limited liability company for help.

BR began providing feed and yardage for 140[2] cows and 72 calves from January 1, 1995 through December 4, 1995. On December 4, 1995, the animals were taken from BR and placed with Robert DeMers, who fed them through April 29, 1996. Following this 140 day hiatus, the herd was then returned to the care of BR, where it remained from April 29th through August 21, 1996.

On May 6, 1996, the brothers sold their 1995 calf crop and, on August 21, 1996, sold their 1996 calf crop. The proceeds of the 1995 and 1996 calf crop, totaling $13,694.01, were released by FSA and paid over to DeMers and BR, which received $12,000 in recognition of its supplier's lien. The calf proceeds are not an issue except to the extent that they figure into the overall lien claim computation.

On September 9, 1996, the brothers sold all animals comprising the base herd and they received net proceeds of $42,384.00, in the form of the three checks now at issue.

3.

In a further and somewhat odd effort to relieve themselves of financial burdens, the brothers transferred ownership of their cattle to BR just shortly after BR had undertaken their care and feeding. Each brother, by a bill of sale dated January 18, 1995, sold "all cows, bulls, machinery, hay, straw, silage, grain and all other farm assets" to BR for a stated consideration. The intent was to have BR assume ownership of the animals in exchange for assuming the outstanding FSA indebtedness. However, FSA balked at the notion of any transfer as it was contrary to the FSA security agreements.

Advised of FSA's position on July 18, 1995, and told by the county supervisor to have BR give bills of sale back to each brother, BR did provide a bill of sale back to each of them on August 21, 1995, for the originally stated consideration. Because FSA would not permit assumption, no consideration ever changed hands and brand registrations remained in the name of the brothers. Possession of the cattle was, however, with BR throughout this period of time. The brothers were also at this time members of the limited liability company and Samuel signed the reconveying bill of sale as BR's manager. On August 21, 1995, BR's Articles of Organization were amended to delete the three brothers as members.

4.

Pursuant to section 35–31–02 of the North Dakota Century Code ("N.D.Cent.Code"), BR filed two sets of agricultural supplier's lien statements;[3] the first set of three was filed for the 340 day feeding period of January 1, 1995 to December 4, 1995 ("1995 lien period") while the second set was filed for the period of April 29, 1996 to August 21, 1996 ("1996 lien period"). The three lien statements of March 15, 1996 are against the base herd and the 1995 calves owned by each

---

**2.** The precise number of animals forming the base herd is unclear as both FSA and BR relied upon the figure of 140 total head in making their lien claim calculations. Yet, at trial the uncontradicted testimony was that the brothers placed 134 cows and 4 bulls in the care of BR. The stipulated facts also use these latter numbers.

**3.** Each of the lien statements is a completed standard form provided by the North Dakota Secretary of State's office providing fill-in blanks which track, and take the required information language, directly from § 35–31–02.

of the brothers. Each 1995 statement of lien provides that "on December 4, 1995," BR provided "feed and care" for fifty cows and twenty-six 1995 calves in the amount of $20,590.00. The second set of three lien statements, filed August 21, 1996, for the 1996 lien period, provides on each that "on May 1, 1996," BR made a sale of agricultural supplies for which a lien is placed upon fifty cows in the amount of $6,450.00. As with the 1995 statements, no reference was made to the 1996 lien period, the only specific date referenced being May 1, 1996. Also, to be distinguished from the 1995 lien statements, the space available to specify the supplies furnished was left completely blank.

Drawing upon books and records of BR, its president and bookkeeper, Loretta Bernstein, testified at trial as to the calculations employed in arriving at the respective lien claims. Total BR feed expenses for 1995 (comprised of feed, labor, utilities, veterinarian and pasture rent) of $77,755.00 were apportioned to the animals in BR's care, with the brothers' cows assigned thirty-three percent, or $25,915.74, thereof. To this was added yardage (delivery and application expenses) of $12,818.00, for a total 1995 lien claim of $38,733.00. The feed expense for the first lien period was premised upon BR providing feed and related services for a 340-day period, which breaks down to twenty-five cents per day per animal (whether cow or calf). The lien for the second 1996 lien period is calculated in the same fashion by charging twenty-five cents per animal per day against the brothers' total herd of 138 cows and 72 calves. According to Loretta's calculations, in 1996 BR fed 72 calves for 127 days and fed 138 cows for 142 days for a total 1996 charge of $27,385.00. Her calculation cannot be reconciled with the stipulated number of care days. By stipulation, BR agreed it fed the brothers' animals only for the 1996 lien period totalling 115 days. Also the lien statements owed for the second 1996 feeding are for $6,450.00 each or $19,350.00 total. Based upon Loretta's figures, BR calculates its total unpaid claims for the first and second lien periods to be $52,423.99 ($38,733.00 plus $27,385.00 = $66,118.00 minus $13,694.01 received from calf sales = $52,423.99).

Accepting daily animal feed costs of twenty-five cents per animal, FSA offered a different analysis of the feed charges for the first and second lien periods. Ervin Krogen, an FSA credit manager, observed first of all that the lien statements for the first lien period were not filed until March 15, 1996. As N.D.Cent.Code § 35–31–02 requires the statement to be filed within 120 days after the supplies are furnished, he counted backwards 120 days from March 15, 1996, which results in November 16, 1995 as being the "last day." Thus, rather than a 340 day lienable period in 1995, his calculation is based upon a 19–day period from November 16, 1995, to December 4, 1995. Using BR's 340–day feed expense of $25,915.74, and dividing it by 340 days, results in a feed cost of $76.22 per day or $1,448.18. He calculated yardage for the same period at $1,007.00 by multiplying 212 head by twenty-five cents per day. Thus, FSA calculates the total lien claim for the 1995, or first, lien period at $2,455.18.

FSA accepts as the correct 1996 second lien period claim, the amounts of $6,450.00 for each brother as shown on the face of the August 1996 lien statements for a total 1996 claim of $19,350.00. After reducing this figure by the $13,694.01 in proceeds received by BR from the 1995 and 1996 calf sales, the lien for the second lien period should be reduced to $5,655.99, according to FSA's arithmetic. Thus, by FSA's calculation the lien, if even available at all, should be $8,111.17, not $52,423.99 as claimed.

FSA also offered lien calculations based upon the fact that the brothers "sold" the animals to BR on January 18, 1995. In FSA's view, from January 18, 1995 through August 21, 1995, BR owned the very animals against which it claims a lien. Assuming this to be a legally untenable position, FSA threw out of its calculation the 218 days of BR ownership, leaving, at best, 122 lienable days between January 1, 1995 and December 4, 1995, which at twenty-five cents per animal per day results in $9,336.95 for feed and $6,177.00 for yardage, for a total possible lien claim of $15,513.00 for the 1995 lien period.

### *Conclusions of Law*

#### 1.

#### *Lien Priority*

FSA, by virtue of its 1998 operating loans and related security agreements, has a prior

interest in the livestock proceeds now in dispute unless BR, by virtue of its competing agricultural supplier's lien, is able to claim lien status with priority over all other liens including that of FSA.

■ FSA argues that BR's lien claim is deficient in a number of respects. While it sees deficiencies in the lien statements themselves, and questions the availability of a lien to BR while it was "owner" of the livestock, its principal challenge rests upon the language of the statute itself. In North Dakota, individuals who furnish agricultural supplies are entitled to an agricultural supplier's lien as set forth in N.D.Cent.Code § 35–31–01, to wit:

> 35–31–01. **Agricultural supplier's lien authorized.** Any person who furnishes supplies used in the production of *crops, agricultural products,* or livestock *is entitled to a lien upon the crops, products produced by the use of the supplies, and livestock and their products including milk.* As used in this chapter, the term "supplies" includes seed, petroleum products, fertilizer, farm chemicals, insecticide, feed, hay, pasturage, veterinary services, or the furnishing of services in delivering or applying the supplies. An agricultural supplier's *lien filed in accordance with section 35–31–02 is effective from the date the supplies are furnished* or the services performed. An agricultural supplier's lien filed as a security interest created by contract to secure money advanced or loaned for any purposes is not effective to secure a priority over liens filed under section 35–05–01. (Emphasis added).

Assuming the proper procedure for obtaining a lien has been followed (N.D.Cent.Code § 35–31–02), the lien achieves the priority specified in section 35–31–03 to wit:

> 35–31–03. **Priority.** An agricultural supplier's lien obtained under the provisions of this chapter has priority, *as to the crops or agricultural products covered thereby,* over all other liens or encumbrances except any agricultural processor's lien. (emphasis added)

The foregoing statutory language is typical of a comprehensive agricultural input lien providing a mechanism by which a supplier of agricultural inputs may obtain a sort of purchase money security interest in the new crop or other products produced through the use of its contributed inputs. *See generally* Rogers, *Collier's Farm Bankruptcy Guide, Agricultural Lien Statutes* ¶ 1.008 (1988). As with other comprehensive lien statutes, section 35–31–01 provides for a lien upon "crops, products produced by the use of the supplies, and livestock and their products including milk." The corresponding section providing for priority of this lien does not mention "livestock and their products." Rather, it states that the supplier's lien has priority "as to the crops or agricultural products." Seizing upon this priority language, FSA argues that as the provisions of section 35–31–01 make a distinction between crops, products and livestock by separately mentioning each, the omission of a specific reference to livestock in section 35–31–03 was an intentional omission. Had the legislature meant to include livestock in section 35–31–03, it could have done so and as it did not, the agricultural supplier's lien claimed by BR does not have priority over any prior lien in livestock—in this case, the proceeds of the base herd. BR, for its part, suggests the two provisions when read together become ambiguous since the lien extended by section 35–31–01 holds no value if it is not accorded priority. Priority is achieved, argues BR, by interpreting the word "agricultural products" as including livestock and the products of livestock. Without this expansive interpretation the purpose of creating a lien in the first place is thwarted, charges BR.

■ As is the case with many lien statutes, it has long been the policy to liberally construe agricultural lien statutes along practical lines so as to give effect to the intent of the legislature. *Stevenson v. Magill,* 35 N.D. 576, 160 N.W. 700 (1916); *Lowe v. Abrahamson,* 18 N.D. 182, 119 N.W. 241 (1908). In divining the purpose or intent of a statute, courts resort in the first instance to the language of the statute itself. *In re Erickson Partnership,* 856 F.2d 1068, 1070 (8th Cir.1988); *In re Smith,* 113 B.R. 579 (Bankr. D.N.D.1990). The language of the statute itself is considered conclusive of legislative intent unless the statute is clearly ambiguous

or creates an irrational result. *Erickson* at 1070; *Western Gas Resources, Inc. v. Heitkamp,* 489 N.W.2d 869 (N.D.1992). Whether a particular provision is ambiguous does not rest solely upon consideration of a single section. Rather, the section and its subject matter should be interpreted in the context of the chapter in which it is placed. That is, legislative intent may be derived from considering and comparing all sections of a particular chapter as a part of the whole. *Thompson v. North Dakota Dep't of Agric.,* 482 N.W.2d 861, 863 (N.D.1992); *Christianson v. City of Bismarck,* 476 N.W.2d 688, 689 (N.D.1991). As recognized by the North Dakota Supreme Court, while separate sections may appear unambiguous when read separately, they can become ambiguous when read together. *State v. Brossart,* 565 N.W.2d 752, 755 (N.D.1997).

Section 35-03-01 when read alone, is not ambiguous. It provides for a supplier's or agricultural input lien for the benefit of anyone providing supplies used in the production of crops as well as livestock and the proceeds of livestock. The phrase "livestock and their products" must mean not only the products in the guise of offspring, but also the base or foundation herd as well. In other words, the lien attaches to *any* animal eating the feed provided. Indeed as the section includes feed, hay and pasturage within its definition of "supplies," the obvious object of these items would be the feeding of livestock.

This construction is consistent with other comprehensive lien statute states. Iowa, Minnesota and Nebraska have comprehensive agricultural liens as well, but in those states the respective lien-creating statute makes the extent of the lien abundantly clear by stating that the lien extends to "all livestock consuming the feed." *See* I.C.A. § 570A.3; M.S.A. § 514.954; Rev.Stat. of Neb. § 52–1406.

■ N.D.Cent.Code § 35–31–03, when read alone, also seems clear but when read in conjunction with section 35–31–01 the coherency of Chapter 35–31, providing for a comprehensive agricultural supplier's lien, is compromised. The entire purpose of the chapter is to afford a very broad lien to anyone providing goods and services used in the production of crops, products or livestock. The whole impetus of agricultural supplier's lien statutes is to provide an alternative source of operational inputs to the distressed farmer unable to secure operating loans from more traditional sources. It strikes this Court as illogical to recognize section 35–31–01 as extending a lien to livestock and thereby encouraging a supplier to provide livestock production and maintenance inputs and then withhold from that supplier the priority necessary to protect the lien. When read together, sections 35–31–01 and 35–31–03 are ambiguous, and section 35–31–03, interpreted as FSA would like it, would eviscerate a large portion of the input providers the chapter was meant to protect, creating in the view of the Court, an irrational result. In the case of *North Dakota Mineral Interests v. Berger,* 509 N.W.2d 251, 255 (N.D.1993), the court pointed out that as statutory lien laws are remedial, they should be construed to effectuate their purposes of protecting those who contribute labor, skill or materials. In a 1991 case, the Supreme Court of North Dakota stated, in interpreting a statute, that it must be presumed that the legislature did not intend absurd and ludicrous results or unjust consequences. *Resolution Trust Corp. v. Dickinson Econo-Storage,* 474 N.W.2d 50, 52 (N.D.1991). BR, through its North Dakota state representative, presented this issue to the North Dakota Attorney General for opinion. The Attorney General, in an opinion issued July 1, 1998, was of a similar view, concluding that the term "agricultural products" as used in section 35–31–03 includes livestock and their products. While it is correct, as FSA points out, that Attorney General opinions are not binding on any court, they are nonetheless important authority on questions involving state law and are generally followed if consistent with a statutory interpretation deemed reasonable to the court. *See Rutten v. R.A.,* 551 N.W.2d 800, 802 (N.D.1996); *Christianson v. City of Bismarck, supra.*

■ There is simply no logical reason why the legislature would with one hand extend a lien to supplier's of livestock inputs and with the other, essentially take it away. As stated in *Interest of K.G.,* 551 N.W.2d 554, 556

(N.D.1996), and reiterated in *Ness v. Ward County Water Resource Dist.*, 585 N.W.2d 793, 795 (N.D.1998), statutes should be interpreted in context, so that each statute on the same subject has meaningful effect without one or the other being useless. *See also Zueger v. N.D. Workers Comp. Bureau*, 584 N.W.2d 530, 534 (N.D.1998). The Court can conceive of no reason to distinguish between those providing crop inputs and those providing livestock inputs. Accordingly, this Court concludes that it is the sense of section 35–31–03, when read as a part of the entire chapter, that lien priority be extended to all persons entitled to a lien under section 35–31–01 including those who provide feed, hay or other services to livestock.

Therefore, if all other prerequisites to obtaining an agricultural supplier's lien have been met by BR then the lien, as obtained; does have priority over that of FSA.

2.

*Livestock Ownership*

■■■■ Before gauging the efficacy of the series of lien statements against the statutory requirements, it is first necessary to consider the question of ownership. Case law in North Dakota is settled that an owner of the benefitted crop or livestock cannot claim a supplier's lien for inputs he himself provides to that crop or livestock. *Thompson v. Danner*, 507 N.W.2d 550, 558–59 (N.D. 1993). In the instant case, FSA argues that BR cannot claim a lien for supplies it provided for the period January 18, 1995 through August 21, 1995, this being the period between the bills of sale given BR by each of the brothers and the date BR reconveyed back to them. During this period, the brothers were members of the limited liability company. In *Thompson, supra*, the parents and children created a joint venture for the purpose of raising potatoes on land contributed by each family. A company owned by the mother provided trucks and harvesters used in the subsequent potato harvesting operation and, in consequence, filed an agricultural processor's lien, pursuant to Chapter 35–30 of the North Dakota Century Code, with priority over a prior bank security interest. The supreme court, agreeing with the trial court, held that the obvious purpose of agri-cultural liens is to insure that a person engaged in providing services for another is paid for them and such statutes were not intended to extend liens in favor of persons providing agricultural inputs to themselves. As a participant in the joint venture, the mother had an interest in the crops themselves and the harvesting expenses for which she claimed a lien constituted a contribution to the common undertaking of the joint venture. Her claim of an agricultural lien for the services was not allowed by the court. The circumstances surrounding the lien claimed by BR for the period in question is similar to those in the *Thompson* case. There it was a family joint venture involved in potato farming. Here it is a family limited liability company involved in livestock. If the livestock can be said to have been "owned" by BR during the time in question, then under the logic of *Thompson* no agricultural supplier's lien can be recognized. BR does not see the substance of the bill of sale transactions as an effective passage of title but rather, a conditional transfer dependent upon BR being able to assume the brothers' FSA debt. BR also points to the fact that the cattle brand remained in the name of the brothers.

■■■■ There is no single definition of what constitutes a "sale." The Uniform Commercial Code defines it simply as the passing of title from seller to buyer. N.D.Cent.Code § 41–02–06 (U.C.C. § 2–106). Black's Legal Dictionary defines the term as "[a] contract between two parties, called respectively, the seller and the buyer, by which the former in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and possession of property." Black's Law Dictionary (6th ed.1990). Webster's defines it as, "the act of selling; a contract transferring absolute or general ownership of property from one person ... to another for a price as a sum of money or any other consideration ..." Webster's Third New International Dictionary 2003 (1996). The foregoing definitions imply a transfer of title to the purchaser but in some situations a sale may in fact be complete notwithstanding a reservation of title in the seller. In the case of branded

cattle the existence of a brand creates a rebuttable presumption that the branded cattle are owned by the holder of the brand. N.D.Cent.Code § 36–09–19. This presumption may be overcome, however, by the existence of a bill of sale which is the usual way branded cattle are sold in North Dakota and which, by its mere existence, is itself prima facie evidence of a sale having occurred. N.D.Cent.Code § 36–09–20. The fact that livestock subject to the bills of sale to BR remained branded to the brothers is not conclusive proof that the brothers did not intend a present sale to BR. *See generally In re Brower,* 104 B.R. 226, 231 (Bankr.D.N.D. 1988). Other circumstances, including the bills of sale themselves, suggest otherwise. Significant is the fact that the brothers surrendered possession to BR and BR undertook the care of and feed for the animals. Although consideration is a necessary component of a sale, the bargained-for consideration need not be immediately due for the sale to be effective. Each of the three bills of sale executed on January 18, 1995, purport to sell all cows and bulls for a fixed dollar amount. In each, the selling brother warrants and agrees to defend the title to the property unto the buyer and each states the livestock has been delivered to the buyer. Although each bill of sale states that BR will assume the FSA debt, the sale is not made conditional upon this happening. From the face of the bills of sale it appears the parties intended an absolute sale effective upon signing.

The Court concludes that to the extent BR is seeking payment for feed and other services provided the animals from January 18, 1995 to August 21, 1995, it is seeking compensation for inputs consumed by livestock it owned. Of the 340 days in 1995 (the 1995 lien period, that is January 1, 1995 to December 4, 1995) that the livestock were provided for by BR and for which a lien is claimed, BR owned the livestock for 218 days, that is from January 18, 1995 through August 20, 1995. Total feed and direct expenses for the 1995 lien period were $25,915.74, or as we have seen, $76.22 per day. This results in an expense of $16,616.00 over the 218–day–BR–ownership period for which no claim may lie. This leaves a valid lienable period of 122 days which at $76.22 per day calculates to $9,300.00.

Total 1995 yardage charges, calculated at twenty-five cents per animal, result in 122 days for 140 cows and 105 days for 72 calves for a total yardage claim of $6,177.50. Thus, after deductions for the 1995 BR ownership period, the maximum agricultural supplier's lien available for the 1995 period is $15,477.00 providing the lien statements otherwise comport with the statutory requirements.

3.

*Lien Statement Requirements*

We come now to the lien statements themselves and here the issue becomes whether BR has adhered to the verified lien statement requirements set forth in N.D.Cent. Code § 35–31–02 sufficient for a supplier's lien to exist. As relevant to the objections lodged by FSA, section 35–31–02 provides:

**35–31–02. Procedure to obtain lien.** To obtain an agricultural supplier's lien ... the person entitled to the lien, within one hundred twenty days after the supplies are furnished or the services performed, shall file a verified statement in the office of the register of deeds of any county in this state or in the office of the secretary of state ... the statement *must* contain the following information:

1. The name and address of the person to whom the supplies were furnished.

2. The name and address of the supplier.

3. A description of the crops, agricultural products, or livestock and their amount or number, if known, subject to the lien together with a reasonable description, including the county as to the location of the crops, agricultural products, or livestock and the year the crop is to be harvested or was harvested.

4. A description and value of the supplies and the first date furnished.

5. The social security number or, in the case of a debtor doing business other than as an individual, the internal revenue service taxpayer identification number of the person to whom the

supplies were furnished. (Emphasis added).

\* \* \* \* \* \*

*The one hundred twenty day filing requirement.*

██ FSA first of all asserts that as section 35–31–02 requires a lien statement to be filed within one hundred twenty days after the supplies are furnished, a lien is available only for expenses incurred within this one hundred twenty day period. Accordingly, since the lien statements for the 1995 lien period were not filed until March 15, 1996, the reach-back period can only go back one hundred twenty days to November 16, 1995, and cannot pick up expenses all the way back to January 1, 1995–an additional ten and one-half months. To this BR responds saying when one reads section 35–31–01 in conjunction with the one hundred twenty day filing requirement of section 35–31–02, it is apparent that a reach-back to the first day the supplies were provided is contemplated. As relevant, section 35–31–01 provides, "... an agricultural supplier's lien *filed in accordance with section 35–31–02* is effective from the date the supplies are furnished ..."

Section 35–31–01 relates to the creation and enforceability of the lien as between the parties themselves. In a sense, it is somewhat analogous to "attachment" except that it appears from the quoted portion above, that as contrasted to U.C.C. secured transactions, it is not even effective as between the parties themselves unless the requirements of section 35–31–02 pertaining to "perfection" are fairly complied with. The phrase, "... from the date the supplies are furnished," as found in section 35–31–01, and the phrase, "... after the supplies are furnished ...," found in section 35–31–02, both reference a particular fixed date. As the agricultural supplier's lien is, in effect, similar to a purchase money security interest, effective notice is essential. Were the date reference in section 35–31–01 an imponderable moveable date having no particular reference point in the lien statement itself, there would technically be no notice and the very purpose of the lien statement would be pointless. Indeed, subpart E of the lien statement form provides space for the lien claimant to put in the specific date when supplies are provided. Coupled with the one hundred twenty day filing requirement, it seems logical that section 35–31–01 requires that, to be effective, the statement must be filed within one hundred twenty days of the date stated on the lien form, otherwise there would be no notice. As regards services provided over a lengthy span of time, as in the instant case, it seems logical and consistent with the purpose of giving notice that the several statutory references to the date supplies are furnished must mean the first date the claimant commenced providing feed or other services. Thus, for the 1995 lien period the date would be January 1, 1995, and for a lien to be effective over the ensuing months a lien statement would have to be filed within one hundred twenty days following January 1, 1995. To hold otherwise and allow, as here, the last date of the service period to be the point from which the one hundred twenty day period is counted would result in a completely unreliable lien statement providing no notice and, further, promoting secret liens. The lien statements filed on March 15, 1996, state that on December 4, 1995, the claimant, BR, provided feed and supplies. To conclude somehow from this that the claim is actually for daily services performed consistently from January 1, 1995 through December 4, 1995, would require a construction of the agricultural lien statutes completely at odds with any notion of normal notice requirements. Indeed, it would even be odd to calculate the day the services were provided by counting one hundred twenty days backwards from the stated filing date, as doing so assumes a date not even on the lien statement and may be, in many cases, completely wrong. This is why requirement 4 of section 35–31–02 specifically requires that the statement provide the *first* date furnished. The Court must conclude that the three lien statements filed March 15, 1996, as referencing December 4, 1995 as the date supplies were furnished, are not in conformity with section 35–31–02, as December 4, 1995 was the last day, not the first day.

The Court agrees with FSA and will allow that if one assumes March 15, 1996, as being the last day of the one hundred twenty day

filing period, then the first date for which a lien could possibly be claimed would be November 16, 1995. This places the period January 1, 1995 through January 18, 1995, completely outside the lienable period and also eliminates the period of August 21, 1995 to November 16, 1995, leaving a lienable period of nineteen days between November 16, 1995 and December 4, 1995. Calculated at $76.22 per day, this would result in a feed and direct expense of $1,448.18. The yardage calculated, as before, over nineteen days for both cows and calves is $1,007.00 for a total recoverable lien claim for 1995 of $2,455.18.

*Lien Statement Deficiencies*

In addition to questioning the one hundred twenty day relation-back, FSA generally challenges the lien statements as not fairly meeting the requirements of section 35–31–02. Specifically, FSA believes the 1995 statements are misleading in several respects.

Whenever the supreme court has had the opportunity to construe lien statutes, it has held that the right of a lien is purely a creature of statute and accordingly the statute must be complied with. *Rolla Community Hosp. v. Dunseith Com. N. Home*, 354 N.W.2d 643 (N.D.1984); *Trinity Builders, Inc. v. Schaff*, 199 N.W.2d 914 (N.D.1972); *Hessinger v. Sorenson*, 180 N.W.2d 910 (N.D.1970). Although the supreme court has not had the opportunity to construe the precise language of section 35–31–02 in the context of a comprehensive agricultural supplier's lien, it has on numerous occasions discerned similar requirements bearing on the many specialty liens now incorporated into Chapter 35–31. In an early decision, the supreme court held that in order to claim benefits under the threshing lien statute (former Chapter 35–07), the claimant must meet the plain words of the statute itself. *Moher v. Rasmusson*, 12 N.D. 71, 95 N.W. 152 (1903). Examining the requirements of the former fertilizer, chemical, and seed lien statute (Chapter 35–09) the North Dakota Supreme Court very strictly construed former section 35–09–02 noting, "It does not simply say 'must be verified' but says specifically 'it must be verified by oath.'" *Agricultural Bond & Credit Corp. v. Courtenay*

*Farmers Co-op. Ass'n*, 64 N.D. 253, 251 N.W. 881, 886 (1933). The only exception to the rule of strict application is the recognition that minor mistakes on a lien statement that are not misleading will not invalidate a claimed statutory lien. *Murie v. National Elevator Co.*, 60 N.D. 665, 236 N.W. 269, 271 (1931). With the foregoing standard in mind we turn now to an examination of the lien statements at issue and FSA's claims of noncompliance.

▆▆ The four requirements set out in section 35–31–02 are, from the use of the word "must," mandatory requirements which unless fairly met will defeat the claimed lien. The third requirement provides that the statement *must* contain a description of the livestock and their amount or number. The lien statements filed by BR for 1995 reference "fifty cows and twenty-six calves (1995)," while the 1996 lien statement merely references "fifty cows." A more complete and accurate description would perhaps include breed type and possibly ear tag numbers. Simply saying the lien pertains to fifty cows is not much of a "description," but the Court recognizes it as a sufficient description when coupled with the location information.

▆▆ The fourth requirement is that the statement must set forth the first date supplies were furnished. All six lien statements were meant to cover services performed over continuous periods. On their face, however, the six statements only set forth a single date as the date supplies were furnished. From our previous discussion one can see how this practice is misleading. The 1996 lien statements may be regarded as accurate as they do set forth May 1, 1996, as the date services were provided and from that date, assumed by virtue of section 35–31–02 to be the "first date," one can make the hundred twenty day calculation. The 1995 lien statements are, however, seriously misleading setting forth as they do the *last* date services were provided. Moreover, as to both lien periods, since the liens were meant to cover continuous periods, it would be better for the statements to have made this clear. As it stands, however, the 1995 statements in this regard are so misleading as to provide no notice at all. The Court believes this deficiency is serious enough to completely defeat the liens claimed for 1995.

Beyond this, FSA charges that the descriptions of supplies and services are deficient as the 1995 statement relates only to "feed and care" while on the 1996 statement nothing at all is set out with the space being left blank. The fourth requirement dictates that the statement contain a description and value of the supplies. The failure of the 1996 statements to make any effort at all to describe the supplies furnished is a fatal omission and the description requirement of section 35–31–02 cannot be regarded as having been fairly complied with. Accordingly, due to the deficiency the claim of lien for 1996 fails.

The description set forth on the 1995 statements also fails in the Court's view to meet the requirements of subpart four as well. The phrase "feed and supplies" is a practically meaningless description giving the reader no notice at all of that for which the lien was intended. If nothing more than this were intended by the requirement of a description, the legislature might just as well have omitted the requirement since the lien generally is available for "supplies and services"—in itself a generic description.

### Conclusion

Although the Court has concluded that an agricultural supplier's lien is available in livestock with priority over all other liens, including that of FSA, it has found there to be fatal deficiencies both as to the amount claimed for 1995 and in BR's failure to fairly comply with the requirements of section 35–31–02–a failure which invalidates its lien claims for both 1995 and 1996 lien periods. Accordingly, and for the reasons discussed, judgment may be entered in favor of the Farm Service Agency and against the Plaintiff, Bernstein Ranch, LLC, dismissing Bernstein Ranch's Complaint. The lien claims of Bernstein Ranch in and to proceeds of the foundation herd sale, in the form of the three checks at issue, are invalid and do not prevail against the prior and subsisting liens of the Farm Service Agency in and to the proceeds.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**