**In re Orville L. PETERSEN, Debtor.**

**IRS, Plaintiff,**

v.

**Orville L. Petersen, Defendant.**

**Bankruptcy No. 03–01548S.**
**Adversary No. 03–9197S.**

United States Bankruptcy Court,
N.D. Iowa,
Western Division.

July 20, 2004.

Donald H. Molstad, Sioux City, IA, for Debtor.

Tax Attorney U.S. Department of Justice, Washington, DC, U.S. Attorney—SC, Sioux City, IA, for Creditor.

## DECISION

WILLIAM L. EDMONDS, Bankruptcy Judge.

The United States of America on behalf of the Internal Revenue Service (hereinafter "IRS") objects to the discharge of debtor Orville L. Petersen. Also, IRS asks that its claim against Petersen be excepted from discharge. Final trial was held on June 16, 2004 in Sioux City. Joan Stentiford Ulmer appeared as attorney for the IRS. Donald H. Molstad appeared as attorney for Petersen.

IRS contends that Petersen's discharge should be denied because he transferred or concealed assets with intent to hinder, delay, or defraud IRS. Alternatively, IRS argues that its claim should be excepted from Petersen's discharge because he willfully attempted to evade or to defeat his obligation to pay income taxes. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

There are few factual disputes. Based on the admitted allegations in the complaint, the uncontested facts agreed to by the parties in the joint pretrial statement, and the evidence at trial, I find these facts:

1. Orville L. Petersen owes the United States (hereinafter "IRS") $66,654.93 in unpaid capital gains taxes, penalties, and interest on the sale of two parcels of farm real property in 1999. The debtor reported a tax owing on his 1999 individual income tax return (Form 1040), which he

filed under the status of "married filing separately." This amount was assessed against Petersen on April 15, 2000. (Joint Pretrial Statement, p. 2, ¶ 1.a).

2. Petersen remains indebted to the IRS for a principal tax amount of $64,230.00, a failure-to-pay penalty in the amount of $16,416.91, and interest to June 2, 2003, in the amount of $16,322.68. As of June 2, 2003, the balance due on his tax liability was $96,969.59. (Joint Pretrial Statement, p. 3, ¶ 1.b).

3. On April 23, 2003, Petersen filed a petition for relief under Chapter 7 of the United States Bankruptcy Code. His bankruptcy schedules reflect no real property, personal property valued at $46,445.50, and liabilities of $210,492.40. Petersen indicated that the amount owed to the IRS was an "unsecured priority claim" for $96,354.00. (Joint Pretrial Statement, p. 3, ¶ 1.c).

4. Orville L. Petersen and Shirlee Petersen are husband and wife. (Joint Pretrial Statement, p. 3 ¶ 1.d).

5. On March 1, 1954, Petersen purchased from his parents two parcels of real property, more fully described legally as:

Parcel 1:

The Northwest Quarter (NW 1/4) of Section Thirty–Three (33), Township Eighty–Seven (87) North, Range Forty–Two (42) West of the 5th P.M., Woodbury County, Iowa.

Parcel 2:

The Northwest Sixty–Five Acres (65 acres) of the Northeast Quarter (NE 1/4) of Section Thirty–Three (33), Township Eighty-seven (87) North, Range 42, West of the 5th P.M., Woodbury County, Iowa.

At the time of the purchase, title to the premises was conveyed to Orville L. Petersen. (Joint Pretrial Statement, p. 3, ¶ 1.e).

6. On May 26, 1978, Petersen deeded Parcel 2 to his wife, Shirlee Petersen, for no cash consideration. (Joint Pretrial Statement, p. 3, ¶ 1.f).

7. From 1953 to 1999, Orville and Shirlee Petersen were actively involved in operating their farm on the real property described as Parcels 1 and 2. The farmland was mortgaged to Heritage Bank and to the Farm Service Agency (hereinafter "FSA"). Orville and Shirlee were liable on those debts. (Joint Pretrial Statement, p. 4, ¶ 1.g).

8. On January 22, 1999, Shirlee Petersen reconveyed Parcel 2 to Orville Petersen. (Joint Pretrial Statement, p. 4, ¶ 1.h).

9. On January 22, 1999, Petersen conveyed a 10–acre portion of Parcel 1 to Shirlee Petersen. The 10–acre portion (Parcel 1(a)) which was conveyed to Shirlee, contained the Petersens' homestead. It is described legally as:

Parcel 1(a):

A parcel of land described as being a part of the Northwest Quarter of Section 33, Township 87 North, Range 42 West of the 5th P.M., Woodbury County, Iowa, further described as follows: Commencing at the Northwest corner of the NW 1/4 of said Section 33; thence N 90′00′00″ E, along the North line of said NW 1/4 a distance of 1075.78 feet to the Point of Beginning; thence continuing on said North line N 90′00′00″ E a distance of 685.92 feet; thence S 10′25′25″ W, a distance of 754.25 feet; thence S 49′20′57″ W, a distance of 175.58 feet; thence N 75′41′33″ W, a distance of 488.80 feet; thence N 10′23′31″ E, a distance of 143.76 feet; thence N 30′27′11″ E, a distance of 399.42 feet; thence N 34′24′01″ W, a distance of 302.61 feet to the POINT OF BEGINNING; said described parcel contains a total of 10 acres, inclusive of a Pub-

lic Roadway Easement of 0.53 Acres. Said parcel is also subject to any and all other Easements of record. (Joint Pretrial Statement, p. 4, ¶ 1.i).

10. On March 25, 1999, Petersen sold Parcel 2 and the remaining 215 acres of Parcel 1 to Steven and Judy Boyle for $369,000.00. (Joint Pretrial Statement, p. 4–5, ¶ 1.j).

11. The sale to the Boyles was for all of the farmland, except the homestead and building site which was then titled in Shirlee's name. The sale to Boyles was by public auction. (Trial testimony).

12. All proceeds received from the Boyles were paid directly to FSA and to Heritage Bank, the creditors having mortgages against the real property, including the 10–acre homestead. Petersen received no cash proceeds from the sale. (Joint Pretrial Statement, p. 5, ¶ 1.k; trial testimony).

13. The distribution of the sales proceeds were as follows:

| | |
|---|---|
| Total purchase price— | $369,940.00 |
| Payment to FSA— | 186,136.32 |
| Payment to Heritage Bank— | 166,855.88 |
| Payment of closing costs, including commission— | 15,947.80 |
| Balance to Petersen— | 0 |

(Exhibit B).

14. At the time Petersen exchanged properties with his wife, he knew that he intended to sell all of the real estate except the 10 acres that would be held in his wife's name. (Joint Pretrial Statement, p. 6, ¶ 1.l).

15. Petersen filed his 1999 Federal income tax return, Form 1040, using the status of "married filing separately," so that his wife would not be liable for the capital gains tax arising from the sale of the farm property. In all other years during their marriage, Petersens filed joint returns. (Joint Pretrial Statement, p. 6, ¶ 1.m).

16. Orville and Shirlee Petersen timely filed their Federal income tax returns, Form 1040, married filing jointly for 1998, 2000, 2001, and 2002. (Joint Pretrial Statement, p. 6, ¶ 1.n).

17. Petersens' debt to FSA was paid in full out of the sales proceeds. There was a balance remaining due to Heritage Bank after the sale. On or about June 15, 1999, Petersens borrowed money from FSA to pay the balance owing to Heritage Bank. The new loan from FSA was $111,400.00. (Exhibit 3). It was secured by a mortgage on the 10–acre homestead. Upon receiving payment, Heritage Bank released its mortgage against the 10–acre homestead. (Exhibit 2). After filing bankruptcy, Petersen reaffirmed the debt to FSA. (Exhibits 3 and 4). Petersens' annual payments to FSA are $19,000.00. The debt was to be repaid over seven years.

18. Petersen lives on the homestead and continues to conduct his farming operation from that location. He stores his farm equipment there. He does not pay rent to his wife in order to occupy the homestead property.

19. At the time of filing bankruptcy, Petersen was lessee of 225 acres of farm ground from Doris M. Campbell (Silkman). (Exhibit 4). At the same time, he was the lessee of 67 tillable acres of farm ground from Judith Enocksen. (Exhibit 4). He reaffirmed both unexpired leases.

20. Petersen has continued to farm since the sale of his land to the Boyles. In 2000, his gross income from farming was $103,758.00. His expenses from farming were $108,872.00, including depreciation expense of $16,167.00. Petersen's net income from farming, without considering depreciation expense, was $11,053.00.

(Exhibit D). In order to pay the annual payment to FSA on the mortgage debt, Petersens used social security income and income from Shirlee's employment.

21. In 2001, Petersen's gross income from farming was $108,048.00. His expenses were $108,829.00, including depreciation expense of $16,825.00. His net income from farming, without considering depreciation expense, was $16,044.00. (Exhibit E). Other income was again used to make the annual payment to FSA.

22. In 2002, Petersen had gross farm income of $107,968.00. His expenses from farming were $110,554.00, including depreciation expense of $17,231.00. His net income from farming, without considering depreciation expense, was $14,645.00. (Exhibit F). Petersens used their other income sources to help make the mortgage payment to FSA.

23. When Petersen filed his 1999 federal tax return, he made no payment to the IRS. He paid other creditors during 1999. (Complaint, ¶ 28; Answer).

24. Sometime after IRS assessed 1999 taxes against Petersen in April 2000, Petersen submitted an "Offer in Compromise" to the IRS. He offered to pay $4,500.00 in settlement of the 1999 tax obligation. (Complaint ¶ 35; Answer).

25. On November 9, 2001, Petersen transferred a 1994 Lincoln automobile to his wife. (Complaint, ¶ 23; Answer). On November 14, 2001, Petersen transferred a 1985 Ford truck and a 1985 Mercury auto to his wife. (Complaint ¶ 24; Answer).

26. When Petersen filed bankruptcy, he did not list in his property schedules any interest in a homestead. (Complaint ¶ 37; Answer). He listed his farm equipment as being owned jointly with his wife. However, on a form he at some time submitted to the IRS, he had shown the farm equipment as belonging solely to him. (Complaint ¶ 40b; Answer).

27. Petersen is 77 years old. He has been married to Shirlee for 53 years. He has farmed during the entire time of the marriage. He has not worked off the farm. Shirlee works off the farm as a supervisor at a day care facility.

28. Petersen's sale of the farm real estate in 1999 resulted from the refusal of Heritage Bank and FSA to finance his operation for the 1999 farm year. He was having financial difficulty with the farm operation. During the 1990s the profitability of his hog operation was not good. He testified that loan "interest was eating me up." He considered trying to restructure his debt in bankruptcy, but he determined the operation could not cash flow. He decided that he had to reduce his debt and that to do so he must sell land. He believed that sale of the bare farm ground would produce the most money for the reduction of debt.

29. He contacted an accountant and an attorney. They advised him on the sale of the ground. The structure of the transactions was based on their advice. This included the exchange of properties with his spouse and the filing of separate tax returns. At the time Petersen transferred the 10–acre homestead to Shirlee in exchange for the 65 acres of farm ground, the 65 acres was worth more than the 10–acre homestead. Both were fully encumbered by the mortgages to Heritage Bank and FSA.

30. The property exchanges with his wife and the sale of the farm ground to reduce debt were intentionally structured to preserve the homestead. The lawyer and accountant advised Petersen to file a separate tax return for 1999 in order to prevent Shirlee from becoming liable for the capital gain taxes resulting from the sale of Petersen's land to Boyles. The 10–

acre homestead was transferred to Shirlee in part to shield the homestead from any future claim by the IRS for taxes arising out of the land sale. In short, Petersen sold the land and incurred the tax obligation. Shirlee did not sell the land, incurred no tax obligation, and became the owner of the homestead.

31. The transfers and Petersen's determination to file a separate tax return for 1999 were planned so as to preserve the homestead from the claim of the IRS. However, in order for the plan to succeed, Petersens essentially had to buy back their home. After the sale to Boyles, Heritage Bank's mortgage against the homestead amounted to $111,400.00. The property was worth only approximately $80,000.00. The couple borrowed the money from FSA to pay off the Bank debt and mortgage. FSA took a new mortgage.

32. If Petersen had not structured the sales transactions as he did, and if all of the land, including the homestead, had been sold in 1999, the sales proceeds would have been insufficient to pay off the first and second mortgages in full. There would have been no value in the property to satisfy any amount of debt to the IRS for capital gains taxes.

33. Despite the fact that Petersen was having financial difficulties in his farm operation after 1999, he did not immediately file bankruptcy. He waited three years, until 2003, to file bankruptcy because he was advised by his attorney that it was not until 2003 that the capital gain taxes would be dischargeable.

34. Petersen relied on the advice of his accountant and his attorney in structuring the transactions, filing his separate 1999 return, and in determining if and when to file bankruptcy.

35. There is no evidence of any intentional falsity in his 1999 return.

36. In 2001, Petersen, through his attorney, responded to questions by the IRS on the land sales and exchange transactions.

### DISCUSSION

■ The IRS complaint appears to include several claims objecting to discharge. However, the parties' pretrial statement narrowed the issues for trial. The statement was adopted by the court as its pretrial order. The order supersedes the pleadings and establishes the issues to be tried. *Lane v. Geiger–Berger Associates, P.C.,* 608 F.2d 1148, 1152 (8th Cir.1979).

### *Objection to Discharge*

The IRS objection to Petersen's discharge is made under 11 U.S.C. § 727(a)(2)(A). That section provides in part that the court shall not grant debtor a discharge if a debtor, with intent to hinder, delay, or defraud a creditor, has transferred or concealed his property within one year before the date of the filing of the bankruptcy petition. 11 U.S.C. § 727(a)(2)(A).

■ The transfer of the homestead took place more than one year prior to the date of filing of Petersen's bankruptcy petition. Therefore, discharge will not be denied on the ground that debtor fraudulently transferred property within one year prior to the filing of bankruptcy.

■ IRS also alleges fraudulent concealment of property. IRS must prove by a preponderance of the evidence that Petersen acted to conceal his property within the one-year prior to his filing bankruptcy, and that the act was done with intent to hinder, delay, or defraud either a creditor or the trustee. 11 U.S.C. § 727(a)(2)(A). IRS contends that Petersen only nominally transferred title to the homestead to his wife, and that he retains actual ownership

of the property. IRS argues that the concealment has continued into the one-year period prior to filing.

■ Concealment of assets may be a continuing event. "Under the established doctrine of 'continuing concealment,' a concealment that originated outside the one-year limitation period is within the reach of § 727(a)(2)(A) if the concealment continued on into the year preceding the filing coupled with the requisite intent." *Kaler v. Craig (In re Craig)*, 195 B.R. 443, 449 (Bankr.D.N.D.1996)(citing *Rosen v. Bezner*, 996 F.2d 1527 (3rd Cir.1993)). Concealment of assets "is typically found to exist where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of that property continued." *In re Craig*, 195 B.R. at 449.

Petersen transferred the 10–acre homestead to his spouse on January 22, 1999. Since the transfer, he has continued to live on the homestead, to store farm equipment there, and to use the property as a base for the farming business. Nonetheless, I do not find that he fraudulently concealed an interest in the property. He transferred title to his spouse. Shirlee Petersen owns the homestead, but Petersen has an equitable interest in the homestead. *See* Iowa Code § § 633.240, 633.236–239, 561.11, 561.12, and 561.15. Petersen occupies the property as spouse of the owner. He has a homestead right in the property. Absent Petersen's consent, Shirlee may not convey the property or encumber it. Iowa Code § 561.13. She may not remove him from the property without his consent. Iowa Code § 561.15. He may claim the homestead exempt. Iowa Code § 561.4. Petersen may rightfully base his occupancy and use of the property on his status as a spouse of the owner. I do not find that he occupies and uses the property based on fraudulently concealed ownership.

Petersen, in good faith, relied on the advice of counsel in attempting to preserve the homestead. This is a factor in my finding that he lacked fraudulent intent. *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir.1986).

■■ It is so that in his bankruptcy schedules he has failed to list his equitable interest in the property. Rights of a debtor, such as dower, are equitable interests which are property of a debtor's bankruptcy estate. Petersen should have scheduled his equitable interest in the property. I find his failure to do so was not fraudulent. Petersen's bankruptcy attorney advised him on structuring the property exchanges so as to preserve the couple's homestead. The attorney was well aware of Petersen's occupation of the premises with his spouse. In representing Petersen in the preparation of the property schedules, the attorney did not list the interest. I observed Petersen during his testimony. Based on his education and training, I doubt he had an independent understanding of his spousal rights in the property. Petersen did not conceal his interest from his attorney. Rarely do attorneys list statutory rights in lieu of dower as assets in a bankruptcy. I believe it is generally oversight. I find no fraud in Petersen's failure to list his homestead interest in his bankruptcy schedules. IRS has failed to prove that Petersen has concealed his ownership in the homestead property with intent to hinder, delay, or defraud IRS or an officer of the estate.

### Tax Evasion

■ IRS contends that its claim should be excepted from Petersen's discharge under 11 U.S.C. § 523(a)(1)(C). That section provides that a discharge under section 727 does not discharge an individual debtor from any debt for a tax "with respect to which the debtor made a fraudulent return

or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C).

 IRS contends that the exchange of property between the spouses, including the transfer of the homestead to Mrs. Petersen, the sale of the farm ground, the filing of separate tax returns, and his filing of bankruptcy were all part of a scheme by Petersen to evade the capital gains taxes on the sale of the farm ground and to preserve the homestead from the claim of the IRS. The IRS recognizes that at the time of the exchange and sale, the Petersens had no equity in any of the real property, and IRS concedes that in 1999 there was insufficient property value beyond the mortgage debts to provide any payment of the capital gains taxes out of a sale of the property. IRS argues that although all the actions taken by Petersen were legal, in sum, they amounted to a scheme to willfully evade taxes.

> If a debtor is aware of the duty to pay his taxes, has the wherewithal to pay the taxes and takes steps to avoid paying them, there is a willful attempt to evade or defeat the tax. Factors which indicate an intent to evade tax obligations include understatements of income, failure to file tax returns, implausible or inconsistent behavior by the taxpayer, the failure to cooperate with the tax authorities, concealment of assets, dealing in cash, shielding income and otherwise frustrating collection efforts.

*May v. Missouri Department of Revenue (In re May)*, 251 B.R. 714, 718 (8th Cir. BAP 2000)(citing *Teeslink v. United States (In re Teeslink)*, 165 B.R. 708, 716 (Bankr. S.D.Ga.1994)) *aff'd by, In re May*, 2 Fed. Appx. 681 (8th Cir.2001).

I find none of the indicating factors in this case. I do find that Petersen and his spouse structured the transactions in an effort to preserve their homestead from a future taking by the IRS. When it was obvious that the Bank and the FSA would no longer finance the farm operation as then structured, and that Petersen would have to sell land to reduce debt, Petersen contacted an accountant and an attorney. Petersen had purchased the farm ground from his parents in 1954. Sale of the property would trigger capital gains tax. The homestead would not be exempt from the claim of the IRS.

I agree with IRS that there was a plan. It was a plan to preserve Petersens' present and future occupancy of the homestead and any future equity in the homestead from the claim of the IRS, the only creditor, other than the mortgagees, who could execute against the home. But it was not a plan to evade paying taxes or to preserve any present equity value from the IRS. After the sale to Boyles, the Petersens still owed about $111,400.00 to Heritage Bank. The homestead was worth only about $80,000.00. In an effort to preserve their homestead, Petersens borrowed the $111,400.00 from FSA to pay off the Bank's mortgage. At the "end of the day," Petersen owed IRS $64,230.00 in taxes arising from the sale, and $111,000.00 to FSA. Petersen had preserved his occupancy of the home and the ownership in his spouse. Shirlee Petersen had no equity in the home, and even had Mrs. Petersen been liable for the tax, there was no value in the property for the IRS.

The effect of Petersen's efforts was to buy a home for more than it was objectively worth and to shield the purchase from any claim against Petersen by the IRS, if and when the couple's efforts created equity in the property for Mrs. Petersen. IRS calls this fraudulent. That Petersen wanted the homestead preserved is understandable. That they were willing to "buy back" their $80,000.00 homestead for $111,400.00 is subjectively understandable.

Some plan was necessary for Petersen to provide a home. Perhaps Petersen had another option. Perhaps Petersens could have sold all the ground, including the homestead. The capital gains tax would have been greater. Petersens would have each been liable for some part of the tax resulting from the sale. They could have filed a joint return. Based on their later tax returns, they could not have purchased a home and paid the tax. They could have rented for three years, filed bankruptcy, obtained discharge of the tax, and tried to buy a homestead when Petersen was in his late 70s. Perhaps the FSA would have loaned them the money to buy a home. Whether this would have worked to provide home ownership I do not know. It is speculation. In reality, Petersen took the route recommended by his attorney and his accountant. He made it possible for his spouse to buy a home on which the IRS could not execute. I do not find or conclude his actions willfully evaded taxes.

IRS might argue that Petersen could have and should have paid the tax debt instead of paying $19,000.00 a year to FSA on the mortgage payment. This arguably is evidence that Petersen had the wherewithal to pay the taxes. I would disagree. The annual payment of $19,000.00 is equivalent to a monthly payment of $1,583.33. This is more than might be expected as a monthly mortgage payment on a modest home. But some payment would be necessary for Petersens to have a home of some type, and the ownership of a farm acreage helped to make it possible to earn the $19,000.00 from a farm operation. A modest home in town likely would not have.

IRS has failed to prove by a preponderance of the evidence that Petersen willfully attempted to evade or defeat the tax obligation arising from the sale of farm ground. Its claim will be dismissed.

IT IS ORDERED that the complaint against Orville L. Petersen by the United States on behalf of the Internal Revenue Service is dismissed.